**UNITED STATES of America, and Interstate Commerce Commission, Petitioners,**

v.

**The GREYHOUND CORPORATION et al., Respondents.**

**UNITED STATES of America, and Interstate Commerce Commission, Petitioners,**

v.

**The GREYHOUND CORPORATION, and Greyhound Lines, Inc., Respondents.**

**Civ. A. No. 69–C–1148.**

**Crim. No. 71–Cr–924.**

United States District Court, N. D. Illinois, E. D.

June 27, 1973.

As Amended July 18, 1973.

See also, D.C., 301 F.Supp. 356.

**532**

John E. Sarbaugh, Joel Davidow, U. S. Dept. of Justice, Chicago, Ill., Lubomyr M. Jachnycky, I. C. C., Bernard A. Gould, Director, Bureau of Enforcement, I. C. C., Bernard M. Hollander, Chief, Judgments & Judgment Enforcement Section, Antitrust Div., U. S. Dept. of Justice, Robert S. Turkington, Chief, Court Enforcement Branch, I. C. C., Washington, D. C., for petitioners.

George Christensen and Edmund J. Kenny, Winston & Strawn, Chicago, Ill., William W. Schwarzer and John R. Reese, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Robert J. Bernard and W. L. McCracken, Phoenix, Ariz., for respondents.

## MEMORANDUM OPINION AND ORDER

ROBSON, Chief Judge.

### I. INTRODUCTION

The United States and the Interstate Commerce Commission (ICC) filed two petitions seeking orders to show cause why the Respondents should not be held in contempt for failing to comply with an order of a three-judge panel of this court, entered February 5, 1970, reported at 308 F.Supp. 1033.[1] The civil con-

tempt petition named as respondents: The Greyhound Corporation, Greyhound Lines, Inc., R. F. Shaffer, J. L. Kerrigan and F. L. Nageotte. The criminal contempt petition was directed only at The Greyhound Corporation and Greyhound Lines, Inc. Pursuant to these petitions this court issued orders for the respondents to show cause why they should not be held in civil and criminal contempt. There was a response to the Orders to Show Cause and the case proceeded.

In accordance with a Pre-Trial Order of March 8, 1972, the two petitions were consolidated for all purposes and there was no evidentiary hearing. The trial record of this case included:

a) The record of the prior proceedings in this case both before the Interstate Commerce Commission and before this Court;

b) The pleadings, interrogatories and supporting affidavits and exhibits on file herein and in Mt. Hood Stages, Inc. v. The Greyhound Corporation, No. 68,374, in the United States District Court, District of Oregon;

c) The testimony taken and exhibits identified in the depositions in this case and in Mt. Hood Stages, Inc. v. The Greyhound Corporation, *supra*;

d) The documents produced by either party in this proceeding and in Mt. Hood Stages, Inc. v. The Greyhound Corporation, *supra*, as well as correspondence between Mt. Hood Stages, Inc. and Greyhound relating to the subject matter of this action.

Because of the large number of individuals who are mentioned in the opinion and to whom reference was made, the court shall identify these persons here and finds:

1. Mr. R. F. Shaffer is President of The Greyhound Corporation. He is a resident of Arizona.

---

1. The opinion in the three-judge case explains in considerable detail the factual matrix out of which these contempt ac-

tions grew. Reference should be made to that opinion for that information.

2. Mr. J. L. Kerrigan is President of Greyhound Lines, Inc. He is a resident of Arizona.

3. Mr. F. L. Nageotte, President of Greyhound Lines-West, an operating division of Greyhound Lines, Inc., with its principal place of business in San Francisco, California. Mr. Nageotte is a resident of California.

4. Mr. Gerald H. Trautman, Chairman of the Board and Chief Executive Officer of The Greyhound Corporation.

5. Mr. Bart Cook, Vice-President of Traffic for Greyhound Lines-West.

6. Mr. R. N. Dick, Vice-President of Transportation for Greyhound Lines-West.

7. Mr. William E. Hastings, Staff Vice-President of Greyhound Lines, Inc.

8. Mr. Bernard Gould, Director of the ICC's Bureau of Enforcement. He is responsible for enforcement by court action of administrative proceedings of all violations of the Interstate Commerce Act.

9. Mr. Fredrick J. Carson, an ICC Rate and Tariff Examiner 1970–1971.

10. Mr. William Niskanen, President of Mt. Hood Stages, Inc., which does business as Pacific Trailways. Throughout this opinion this company shall be referred to as "Mt. Hood". It should also be noted that Mt. Hood was permitted to intervene in this action for the limited purpose of submitting a statement in support of the government's civil contempt petition and to appear at any hearing held on the issue of civil relief.

11. Mr. George A. Warrington, Vice-President and General Manager of Pacific Trailways.

12. Mr. Thomas E. Donohue, Traffic Manager of Pacific Trailways.

The court, having studied the testimony and exhibits submitted in this cause, and having examined the written briefs of counsel, and being fully advised of the premises, further finds as follows:

The jurisdiction of the court is not disputed.

The Greyhound Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Phoenix, Arizona.

Greyhound Lines, Inc., is a corporation organized and existing under the laws of the State of California with its principal place of business in Phoenix, Arizona. It is a wholly owned subsidiary of The Greyhound Corporation. Greyhound Lines, Inc., was a plaintiff in civil action 69–C–1148 and was subject to the order of this court entered February 5, 1970.[2]

The geographic setting for these contempt proceedings is Oregon, Idaho, Washington, and California. The several small cities mentioned regularly in the opinion are: Klamath Falls, The Dalles, Biggs, and Bend, Oregon; Redding, California; Pasco and Yakima, Washington.

The respondents Shaffer, Kerrigan, and Nageotte are actively engaged in the management, direction and control of Greyhound's affairs and are responsible for Greyhound's compliance with the order of this court entered in civil action 69–C–1148 on February 5, 1970.

 Since the order was entered in this case, Greyhound has engaged in a course of conduct which evidences a willful failure to comply with several of its paragraphs. Gradually, the pressure of this contempt litigation forced Greyhound to bring its conduct into conformity with many aspects of the order. This conclusion is supported by examining Greyhound's eleventh hour remedial action.[3] While these belated corrective

---

2. Whenever used in this opinion, "Greyhound" shall mean The Greyhound Corporation and Greyhound Lines, Inc.

3. In October and November, 1971, Greyhound finally complied with provisions 1 and 6 of the order by correcting many of

actions may eliminate the need for further civil sanctions, they will not erase the record of past contempt, nor obviate the appropriateness of criminal sanctions. A criminal contempt proceeding is punitive in nature. It serves to vindicate the authority of the court where a defendant has willfully disobeyed a lawful court order, Gompers v. Buck's Stove and Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Furthermore, a criminal contempt cannot be ended by any act of the contemnor, In re Curtis' Petition, 240 F.Supp. 475 (E.D.Mo.1965).

The evidence presented in this case compels the court to conclude that Greyhound willfully violated Paragraphs 1, 3, 4, 5, and 6 of this court's order and that such willful violations were established beyond a reasonable doubt. The court further finds that there was no criminal contempt as to Paragraphs 2, 8, and 9.

██ As to Paragraphs 1, 3, 4, 5, and 6 the Court finds that Greyhound had notice of the order and that it willfully failed to embark on a program of compliance that would meet the requirements of the order. With respect to some paragraphs, Greyhound failed to take any steps toward compliance. With respect to others, Greyhound interpreted the order in such a way as to render it meaningless. Yet the law is clear that a party who makes his own determination as to the meaning of a decree, acts at his peril. If Greyhound had doubts as to its obligations under the order, it could have petitioned this court for a clarification or construction of that order. McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The law is equally clear that even where there is "no open and direct defiance," a company which acts under a "twisted interpretation" that would render a decree ineffective may be found guilty of civil and criminal contempt. United States v. Gamewell Co., 95 F.Supp. 9, 13 (D.C.Mass.1951). So in this case Greyhound acted under twisted interpretations of parts of the court's order which lead it to violate that order.

To illustrate and support the court's conclusion, it is necessary to review the conduct of the respondents in light of the plain language of the order.

## II. CRIMINAL CONTEMPT CHARGES

### VIOLATIONS OF PARAGRAPH 1

██ Paragraph 1 required Greyhound to show Mt. Hood's schedules on an equal basis with other non-Greyhound lines.[4] The government's crimi-

---

the maps and schedules which Mt. Hood had complained of from 1964 to the spring of 1970. Effective November 10, 1971, Greyhound revised its schedules so as to eliminate the southbound three hour delay at The Dalles, something which Greyhound could have done unilaterally soon after the order was entered. Effective November, 1971, Greyhound revised its schedules so as to establish a good connection with Mt. Hood's eastbound bus from Eugene, Oregon. This was a matter that Greyhound promised to "look into" in April, *1970*, but failed to do anything about until several months after the contempt petitions were filed. In September, 1971, Greyhound finally informed its agents and lower echelon employees that the company was under a court order, and provided them with the text of that order. See Government's Brief 6–8.

4. In briefing the issue of whether Greyhound treated Mt. Hood on an equal basis with other non-Greyhound carriers, the government judges Greyhound's conduct by the standard of whether the schedules would enable agents and passengers to select the most direct, fastest, and/or most convenient service. Greyhound vigorously opposed the use of this standard claiming that it was not dictated by the terms of the order and that the use of the standard would involve too many judgmental factors to afford a basis for a finding of contempt.

The court has carefully considered the problem raised by the use of such a standard and has concluded that the issue of whether Greyhound treated Mt. Hood on an equal basis can be decided without reference to the proposed government standard. Rather, the court has examined the evidence only with a view toward determining whether Mt. Hood was treated on an equal basis with other non-Greyhound carriers, i. e., that Mt.

nal contempt petition charged that Greyhound failed to treat Mt. Hood on an equal basis with other non-Greyhound lines in that numerous Greyhound schedules failed to depict Mt. Hood's connecting or interline service, but that Greyhound did depict the service of other non-Greyhound lines on analogous tables.

The evidence shows beyond a reasonable doubt that Greyhound did not treat Mt. Hood on an equal basis with other non-Greyhound lines. For example, in January, 1970, Greyhound table 603A failed to show Mt. Hood's connecting service between Portland, Bend, and Salt Lake City. In July, 1970, five months after the court's order, Greyhound added Mt. Hood's connecting service between Boise and Salt Lake City, but still omitted Mt. Hood's service originating in Portland destined for Madras, Bend, and Salt Lake City. The fastest route between Portland and Bend, Oregon is via Mt. Hood. Since Greyhound does not serve Bend, this route via Mt. Hood is a connecting schedule with Greyhound at Portland. Greyhound shows schedules of other carriers which connect Greyhound service with points that Greyhound does not serve. For example, in table 585 Citizen Auto Stage Company's service between Tucson, Arizona (which Greyhound serves) and Nogales, Arizona (which Greyhound does not serve) is shown. In this table, Greyhound shows *all* of Citizen's service between these points. Thus, Greyhound's omission of Mt. Hood's service between Portland and Bend was discriminatory against Mt. Hood as opposed to its treatment of other non-Greyhound carriers. It is significant that in October, 1971, four months after the contempt petitions were filed Greyhound, in an effort to expiate its sins, saw fit to include Mt. Hood's service from Portland to Bend in table 603A.

Greyhound argues that it was not obligated to show this particular route because it was directly competitive with an all Greyhound route, and that the government has not shown that the failure to show this particular route constituted unequal treatment of Mt. Hood. These arguments are not convincing. Greyhound was under an ICC order since December, 1968, to show the route in question.[5] Furthermore, the government did show that the omission of the Mt. Hood route in question did constitute unequal treatment by reference to Greyhound table 585 above.

If Greyhound was of the opinion that it was not required to show directly competitive service it should have asked this court for an interpretation or modification of the order. As the Supreme Court stated in McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949):

> "Yet if there were extenuating circumstances or if the decree was too burdensome in operation, there was a method of relief apart from an appeal. Respondents could have petitioned the District Court for a modification, clarification or construction of the order. . . . But respondents did not take that course either. They undertook to make their own determination of what the decree meant. They knew that they acted at their peril."

So in the present case, Greyhound could have sought guidance from this court if it was of the opinion that directly competitive service need not be shown.

Finally, Greyhound was under a court order to show Mt. Hood's services on an equal basis with other non-Greyhound lines. While it may be true that Greyhound cannot, or physically could not, show all connecting service from each city it serves, Greyhound should have

Hood was treated *at least as well as other non-Greyhound carriers.* The findings of this court are based solely upon this criteria. No view on the merits of the government's standard is hereby intimated, inasmuch as the court has con-

fined itself to the "equal basis" language of the order.

5. See ICC Order in MC–F–9136 dated December 4, 1968 and Report and Order of Examiner Winson in MC–F–9136 dated July 31, 1967, pp. 47–61.

taken special care in this case to include Mt. Hood's service in its folders. This is especially true since Greyhound had been constantly reminded by Mt. Hood and the ICC that its efforts to comply with Paragraph 1 were not up to standard.[6]

Additional evidence of unequal treatment is found in table 603. The basic problem with this table was that it showed many off-route points, thus failing to indicate that the Greyhound-Mt. Hood through-bus service via Klamath Falls was *direct* between Klamath Falls and The Dalles. The table also failed to show the departure time from The Dalles and the interchange point of Smithsville for the connecting Mt. Hood-Greyhound service to Yakima and Ellensburg.

Furthermore, table 603 shows schedules 821 and 822, the through-bus. The presence of these schedules in table 603 made it appear as if these Mt. Hood schedules (jointly with Greyhound) were being run through Portland, when actually the runs were *direct* between The Dalles and Klamath Falls. Greyhound also continued to show in table 603, labeled "San Francisco-Spokane", the all Greyhound service via Portland.

That Mt. Hood was not being treated by Greyhound on an equal basis is evident from Greyhound's showing of other lines on analogous tables. For example, table 117, in a comparable situation, Greyhound shows the through and connecting service with Bonanza Bus Lines, Inc., without including intermediate off-line points which would make the table unclear.[7]

In October, 1971, twenty months after this court's order and four months after the contempt petitions were filed, Greyhound corrected table 603 so as to eliminate the confusion generated by the showing of off-route points. This correction also brought the presentation of Mt. Hood's schedules by Greyhound more into conformity with Greyhound's treatment of other non-Greyhound lines.

Further evidence of unequal treatment is found in Greyhound table 31C, which presented some of Mt. Hood's routes in a distorted and confusing manner. Prior to the court order, Greyhound's through-bus service between San Francisco and Spokane via Portland was shown. Five months after the court order this table was revised to show Greyhound-Mt. Hood through-bus service between San Francisco and Spokane via Klamath Falls. However, the table also showed several off route points creating the impression that the service went through these points when in fact it did not. The July, 1970, version of this table failed to show Greyhound-Mt. Hood connecting service.[8]

In July, 1971, Greyhound began to show the connecting times for several of the off-route points. But Greyhound still failed to show the Greyhound-Mt. Hood connecting service.

In October, 1971, Greyhound eliminated some of the off-route points. The connecting service to Sacramento and Los Angeles was shown in a clear and satisfactory manner. In addition, Greyhound revised the table to include Greyhound-Mt. Hood connecting service. However, this was shown incompletely as Greyhound's service from Spokane to The Dalles was omitted. Consequently, passengers and agents would not be aware that one could transfer to a Mt. Hood bus at The Dalles. It was not until January, *1972*, that Greyhound's connecting schedule from Spokane to The Dalles was added.[9]

That Greyhound was not treating Mt. Hood on an equal basis becomes clear when table 31C is compared with Greyhound table 31B, which immediately precedes table 31C. Greyhound's table 31B shows schedules between Seattle, Portland, Reno, Las Vegas and Phoenix. This table not only shows the through-

---

6. See Government's Brief pp. 37–48.

7. See Carson Deposition pp. 46–47.

8. See tables in Government's Brief p. 59.

9. See tables in Government's Brief p. 60.

bus service via Greyhound, Las Vegas-Tonapah-Reno Stage Lines, and Sun Valley Bus Lines, but also shows the connecting service for the same carriers. Connecting services via Greyhound and Mt. Hood, however, were not shown for the succeeding table 31C. It is thus clear that Greyhound did not treat Mt. Hood's schedules at least as well as it treated other non-Greyhound carriers' schedules.

Greyhound stated that upon filing of the contempt petitions it revised several schedules, including table 31C so as to remove the alleged distortions and omissions. However, as indicated above, table 31C did not completely and accurately show Mt. Hood's service until six-months *after* the contempt petitions were filed.

The government also charged that Greyhound's omission of table 31C from Greyhound Lines-West Timetable and Greyhound time folders was an act of discrimination against Mt. Hood. That Greyhound did not treat Mt. Hood on an equal basis with other non-Greyhound carriers is readily apparent from examples such as Greyhound's inclusion of table 12A in its *Systems Timetable*. Table 12A shows through service between Dallas, (Texas) Albuquerque, and California via Orange Belt Stages, Texas, New Mexico, and Oklahoma Coaches, and New Mexico Transportation Co. Table 31C, showing service from California to Washington is an analogous table and under the order should have been included in the *Systems Timetable* along with table 12A.

Greyhound contends that table 31C is one of a special group of tables which are designed to show through service, not connecting service, between major points. However, the court is of the opinion that if Greyhound did not think it should be required to show Mt. Hood's

connecting service on table 31C it should have sought a modification, clarification, or construction of the order. See McComb v. Jacksonville Paper Co., *supra.*

In light of the foregoing, the court must conclude that Greyhound willfully failed to treat Mt. Hood on an equal basis with other non-Greyhound carriers in that tables 603, 603A, and 31C failed to depict Mt. Hood's service at least as well as Greyhound depicted the service of other non-Greyhound lines.[10] Also, the failure to include table 31C in the *Systems Timetable* was discriminatory as against Mt. Hood.

■ The element of willfulness required to support a finding of criminal contempt is established by the fact that Greyhound unreasonably delayed in complying with the mandate of Paragraph 1.[11] As shown above, many of the required changes in tables were not made until after the contempt petitions were filed (eighteen months *after* the order was entered). Greyhound's failure to effect corrections for this length of time hardly evinces an attitude of good faith or cooperation. It appears that Greyhound was playing fast and loose with the court, the ICC, and Mt. Hood. Greyhound chose to delay compliance rather than promptly and fully complying with the order at the time it was entered. Greyhound either claimed it did not think the order required it to do things which are now charged as contempt, or Greyhound acted under strained interpretations of the order that tended to make Paragraph 1 meaningless. Once the criminal contempt petitions were filed, however, Greyhound moved with great speed in fulfilling the mandate of Paragraph 1. Yet Greyhound never indicated to this court that compliance would not be possible, nor did Greyhound ever seek a clarification or construction of the order, as it had

---

10. The government also charged that table 501 discriminated against Mt. Hood. The court has carefully reviewed this charge and concludes that the government has failed to prove table 501 discriminated against Mt. Hood.

11. Cf. N.L.R.B. v. Rath Packing Co., 130 F.2d 540 (8th Cir. 1942), in which the court held that the company was in contempt for waiting more than a year to inform employees of the NLRB opinion and order.

the right to do, Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 15, 65 S.Ct. 478, 89 L.Ed. 661 (1945). Instead Greyhound chose to act upon its own interpretation of the order, but in doing so it acted at its peril, McComb v. Jacksonville Paper Co., supra. Greyhound had been warned on numerous occasions by Mt. Hood and the ICC that they did not think its conduct was in conformity with the requirements of the order.[12] Greyhound had ample opportunity to either: (1) comply with the suggestions of those parties or, (2) seek the guidance of this court if it was of the opinion that the demands of the ICC and Mt. Hood were unreasonable. But Greyhound chose to do neither until after the contempt petitions were filed thus displaying a total lack of concern for compliance with Paragraph 1 of the order. Under these circumstances, the court must conclude that there was a willful failure to comply with Paragraph 1, and accordingly, the court hereby finds Greyhound in criminal contempt.

## VIOLATIONS OF PARAGRAPH 2

Paragraph 2 required Greyhound: (1) to restore the through-bus service which Greyhound operated until September 8, 1964, in connection with Mt. Hood via Klamath Falls and The Dalles, Oregon; and (2) discontinue the bus service Greyhound has operated in substitution therefor since then via Portland, Oregon.

The government charged in the criminal contempt petition that Greyhound willfully disobeyed Paragraph 2 in that Greyhound did not discontinue its practice of routing passengers over its route via Portland, in substitution of the Greyhound-Mt. Hood joint through-route. The court, having carefully considered the petition, response, and the briefs, is of the opinion that the government has failed to prove beyond a reasonable doubt that Greyhound violated Paragraph 2. The government's own admissions that Greyhound has fulfilled both requirements of Paragraph 2 eliminates any basis for a finding of either civil or criminal contempt.[13]

■ It appears from the government's petition and brief that the gist of the complaint against Greyhound is that it has failed to take affirmative measure to stop the practice of routing passengers over its Portland route, thus diverting traffic from the Greyhound-Mt. Hood joint through-bus.[14] However, nothing in the order required Greyhound to promote traffic over the Greyhound-Mt. Hood joint through-bus. Furthermore, the order did not prohibit Greyhound from providing alternative routes through Portland to points in Washington. In fact, such competitive service has long existed in the California, Oregon, and Washington area.[15] And it should be no surprise that the all-Greyhound route from California through Portland to Washington will attract many passengers away from the Greyhound-Mt. Hood joint through route. Mr. Donohue of Mt. Hood stated:

> "In all cases these very fast [Greyhound] schedules compete with service via the joint-route (Spokane and Yakima) . . . . I don't know what it is worth but it does show that the all

12. The problems relating to the showing of Mt. Hood's routes on Greyhound's schedules and folders were discussed between the parties either by letter or meeting in March, April, and May, 1970. See Government's Brief pp. 37–42, 44–45, 49–51.

13. The government brief states that "Greyhound has re-established a joint through-bus with Mt. Hood (in April, 1970) from California through Klamath Falls and The Dalles, to points in central and eastern Washington. . . . [and]

Greyhound discontinued its through-bus from California via Portland to points in Washington." Government Brief 64–65.

14. The government based its charge on the fact that an ICC and Greyhound routing study suggested that a great majority of passengers traveling from California to points in Washington were routed over the longer, slower, all Greyhound route through Portland.

15. See Respondent's Brief at 59.

Greyhound schedules are very competitive with joint service routes."[16]

The final government charge relating to alleged violations of Paragraph 2 is based upon the fact that Greyhound altered schedule 1622, the San Francisco-Seattle express. The government contends that this change was made in order to divert passengers from the joint through-bus, thereby injuring Mt. Hood. However, the government also admitted that Greyhound may have had proper reasons for making the schedule change:

> "[i]t is arguable that *there were proper reasons for improving the connection of schedule 1622 with busses to points in Washington,* such as to enable passengers from the Willamette Valley in Western Oregon to make good connections to points in Washington, . . ." (Emphasis added) [17]

Thus, the government itself has indicated that the reasons for the change in schedule 1622 may or may not have been to divert traffic from the joint through-bus. The fact that this schedule change may have diverted some passengers from the joint through-bus is not conclusive that Greyhound violated Paragraph 2, for that paragraph did not require that a certain percentage of traffic travel by way of the through-bus. The order merely required that Greyhound *restore* the San Francisco-Spokane joint through-bus via Mt. Hood's route between Klamath Falls and The Dalles (Biggs) and to *discontinue* its own substitute service via Portland.

The court, having found that Greyhound has done that which was required of it, hereby finds Greyhound not guilty of either civil or criminal contempt for alleged violations of Paragraph 2.

## VIOLATIONS OF PARAGRAPH 3

Paragraph 3 ordered Greyhound to revise its interline schedules in connection with Mt. Hood so as to eliminate the presently existing delay of approximately three hours for passengers seeking to travel between California and Spokane via Mt. Hood's route. Paragraph 3 also required Greyhound to negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public.

On the evidence presented, the court is of the opinion that Greyhound willfully violated Paragraph 3 in that it did not eliminate the three hour delay until eighteen (18) months after the entry of the order, and did not negotiate in good faith.

### A. The Three Hour Delay

The contempt petition charged that Greyhound failed to revise its interline schedules in connection with Mt. Hood so as to eliminate a three-hour delay for passengers seeking to travel between California and Spokane via Mt. Hood's route. Greyhound's schedule 2933 from Spokane arrived at The Dalles more than three hours before the departure of Mt. Hood schedule 16 which travels south and connects at Klamath Falls with a Greyhound schedule traveling to California.

Greyhound took the position that Paragraph 3 of the order overlapped with Paragraph 2, and that by complying with Paragraph 2 (restoring the joint through-bus), compliance with Paragraph 3 was achieved. See Respondent's Brief 65, 68–69. The court cannot agree with this interpretation, for if the requirements of Paragraph 3 were incorporated in Paragraph 2, then there would have been no purpose in having Paragraph 3. The very language of the order demonstrates that there is a difference between the "through-bus service" referred to in Paragraph 2, and the "interline service" in Paragraph 3. Interline service involves an exchange of passengers from a Greyhound bus to one of Mt. Hood's, whereas through-bus service involves utilization of the same equipment (bus) over one or more routes. A Greyhound officer even ac-

16. See Donohue's letter of Justice Dept., Ex. RX 3.

17. Government Brief 65.

knowledged the difference. See Nageotte Deposition 113. The court must conclude that the requirements of Paragraph 3 are separate and distinct from those of Paragraph 2 and that compliance with Paragraph 2 (restoration of the joint through-bus) did not result in compliance with Paragraph 3 (revision of interline schedules to eliminate the three-hour delay).[18]

The court further finds that the condition that Paragraph 3 was designed to remedy, i. e., the elimination of the three-hour delay, was exclusively within Greyhound's control. It *alone* had the power and ability to effect the schedule changes required by Paragraph 3. Yet the record shows that Greyhound failed to make those changes *until November 10, 1971, eighteen months after the entry of the order and three months after the amended contempt petitions were filed.* Notwithstanding the respondent's protests, it appears clear that the impetus for making the changes in November, 1971 was the filing of the contempt petitions. The court further finds that there was no plausible excuse for Greyhound's failure to comply promptly with the mandate of Paragraph 3. Its delay in complying with this paragraph constituted willful disobedience of the order. Accordingly, the court finds Greyhound in criminal contempt for failing to eliminate the three hour delay in a timely and expeditious manner.

### B. Violations Regarding Greyhound's Failure to Negotiate in Good Faith.

Paragraph 3 of the order required Greyhound to " . . . negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public . . . . " The Amended Contempt Petition charged that Greyhound failed to negotiate in good faith to provide convenient connections between its service from Coos Bay, to Eugene, Oregon and Mt. Hood's service from Eugene to Bend, Oregon and also for service in the opposite direction. The government also charged that Greyhound failed to provide good connections between its services from Twin Falls to Pocatello, Idaho, via Burley, Idaho and Mt. Hood's service from Portland, Oregon, to Salt Lake City, Utah and for service in the opposite direction.

Greyhound denied that it refused to negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public. It further stated that it has revised its schedule from Coos Bay, Oregon and points south to make a 30 minute connection at Eugene with Mt. Hood's run 6E eastbound. This revision, claims Greyhound, eliminates the basis for the charge that Greyhound refused to negotiate in good faith about the connection at Eugene. However, the context in which the changes were made is more important, for criminal contempt purposes, than the fact that changes were eventually made. The manner in which the negotiations were conducted must be examined to determine whether Greyhound negotiated in good faith.

In an effort to secure compliance with the requirement of Paragraph 3, Mt. Hood's officials met and corresponded several times with Greyhound's officials.[19] During these meetings, Mt. Hood made specific proposals toward improving connections at Eugene, Oregon. Greyhound's standard response to these proposals was that it would consider and work on them. Greyhound took no affirmative action until October 6, 1971, (3 months after the contempt petitions were filed) when it announced that effective November 10, 1971, the Eugene

---

18. If Greyhound felt that compliance with Paragraph 3 would have caused a hardship or inconvenience, it could have petitioned the court for a modification of the decree. See McComb v. Jacksonville Paper Co., *supra*.

19. Meetings were held March 9 and 24, 1970 and a letter was written March 19, 1970. See Government Brief 82–84.

connection was being improved. The change was basically that which Mt. Hood had suggested *eighteen months earlier*. A Greyhound official admitted that there was no reason why it would have been more difficult to implement the change when it was first suggested by Mt. Hood in March, 1970, than it was in November, 1971.[20] This admission corroborates the court's conclusion that Greyhound was dragging its feet during these negotiations and that Greyhound's course of conduct was not in good faith.

■ As for negotiation pertaining to the Burley, Idaho connections, the government asserts that Greyhound did nothing to solve this problem until more than four months after the amended contempt petitions were filed. However, the government also admitted that the solution to the Burley problem was more difficult to arrange. The change of the Burley connection would require schedule changes by Mt. Hood, which Mt. Hood conceded would be difficult to change because its schedules were tied to the system schedules of Continental Trailways. Under these circumstances, it is difficult to state with absolute certainty that Greyhound refused to negotiate in good faith about the Burley connection. Nevertheless, the order merely required Greyhound to negotiate with Mt. Hood, not necessarily agree. It is true that Mt. Hood never made a specific proposal with regard to the Burley problem, but having had its proposals for the Eugene problem repeatedly ignored, it would appear to have been a useless act for Mt. Hood to have drawn up a detailed proposal with regard to the Burley connection. Furthermore, although Greyhound was aware of the Burley problem, it took no action to solve this problem until four months after the contempt petitions were filed. In light of these facts, the court must conclude that Greyhound willfully failed to negotiate in good faith with Mt. Hood. The record is silent as to any attempt by

Greyhound to reach an accord with Mt. Hood on their mutual problems.

■ The duty to negotiate in good faith means at least that the parties have an obligation to participate actively in deliberations so as to indicate a present intention to find a basis for agreement. N.L.R.B. v. Montgomery Ward & Co., 133 F.2d 676, 686 (9th Cir. 1943). There must also be a sincere effort to overcome obstacles or differences between the parties, N.L.R.B. v. Wonder State Mfg. Co., 344 F.2d 210, 215 (8th Cir. 1965). The record before the court fails to indicate that Greyhound ever negotiated with a present intention to find a basis for agreement, or that it ever sincerely endeavored to overcome obstacles that existed between it and Mt. Hood.

Greyhound's principal defense to the charges relating to Paragraph 3 is that the government based its complaint on the fact that Greyhound failed to reach an agreement with Mt. Hood on the various changes, not on a failure to negotiate in good faith. Greyhound states that it is settled that the duty to negotiate in good faith does not include a duty to agree. See N.L.R.B. v. Taormina, 244 F.2d 197, 198 (5th Cir. 1957); N.L.R.B. v. Whittier Mills Co., 123 F.2d 725, 728 (5th Cir. 1941). Greyhound points to the government's characterizations of the meetings between Greyhound and Mt. Hood as "friendly" in support of its position that there was no refusal to bargain in good faith, only a failure to agree.

Greyhound's contentions are without merit. First, the Warrington and Niskanen affidavits make it clear that the matter of improved bus connections at the various points was discussed on more than one occasion. During the meeting of March 24, 1970, Warrington made specific proposals to bring about compliance with Paragraph 3. At the same time he offered to alter Mt. Hood's schedules to facilitate compliance with Paragraph 3. Furthermore, once War-

20. Dick Deposition 11.

rington made his proposals to Greyhound the matter of achieving compliance with the order was in Greyhound's hands. At that point it had to either implement the proposals of Mt. Hood or develop some of their own which could then be considered by Mt. Hood. But Greyhound chose to take the matter under advisement for some eighteen months; then it implemented a plan similar to the one Warrington suggested in March, 1970. Greyhound then has the audacity to state that by implementing the changes the basis for the contempt charge was removed. While the duty to negotiate in good faith does not necessarily include the duty to agree, it certainly imposes a duty to respond to a good faith proposal put forth by your adversary. Rapid Roller Co. v. N.L.R.B., 126 F.2d 452, 459 (7th Cir. 1942). The record of the present case fails to indicate that Greyhound made any response or counter-offer to any of Mt. Hood's suggestions. The standard refrain appears to be that it would consider Mt. Hood's proposals or alternative solutions, but no action was taken by Greyhound until after the contempt petitions were filed.

The court therefore finds beyond a reasonable doubt that Greyhound willfully failed to comply with the good faith negotiation provision of Paragraph 3, and finds Greyhound in criminal contempt.

## VIOLATIONS OF PARAGRAPHS 4 and 5

Paragraph 4 of the order required Greyhound to voluntarily and accurately quote joint through *routes* in connection with Mt. Hood, without geographical limitations, in a manner fully responsive to inquiries from the traveling public. Paragraph 5 required Greyhound to cease and desist from quoting Mt. Hood's service unfavorably or inaccurately in response to inquiries from the

traveling public and from not quoting Mt. Hood's service at all in response to specific requests from the traveling public.[21]

The criminal contempt petition charges that the respondents and their agents knowingly and willfully disobeyed Paragraphs 4 and 5 in that Greyhound and its agents (1) were not voluntarily and accurately quoting joint through routes in connection with Mt. Hood and (2) were not quoting Mt. Hood's services at all in response to requests from the traveling public as to the shortest, fastest, and least expensive and/or most convenient service available.

Specifically, the government charged Greyhound as follows:

(1) In June and July, 1970, the ICC conducted a survey to determine the extent to which Greyhound was quoting Mt. Hood's service in accordance with the order. The survey revealed that out of 80 inquiries, 47 of the responses, or 58%, received were incorrect, in that they did not voluntarily and accurately quote Mt. Hood's service when that service was the shortest, fastest, least expensive and/or most convenient.

(2) In July, 1971, the ICC conducted an additional survey to measure Greyhound's compliance. This survey revealed that 58 of the responses, or 51%, received were incorrect in that the agent did not voluntarily and accurately quote Mt. Hood's service when the service was the shortest, fastest, least expensive and/or most convenient.

(3) From February 5, 1970, to August, 1971, Mt. Hood conducted its own survey to determine the extent to which Greyhound was complying with the order. Mr. Donohue, Mt. Hood's traffic manager, conducted this survey at Greyhound terminals in the western United States. This survey showed that out of 316 telephone inquiries, 239 of the responses or 75%, received were incorrect,

21. The government has presented its evidence of the violations of these two paragraphs together. Consequently, the court has treated these paragraphs in a like manner.

in that the joint service was not voluntarily and accurately quoted where joint service was faster, shorter, least expensive and/or more convenient.

(4) On May 26, 1970, Donohue gave Greyhound a report of 84 incorrect responses he had received from 39 different terminals subsequent to February 5, 1970. Later results of Mt. Hood's survey showed 118 additional incorrect responses were received at 24 of the same terminals about which Mt. Hood had previously complained to Greyhound.

(5) Finally, it was charged that Greyhound violated Paragraphs 4 and 5 of the order by issuing directives to its agents which were grossly inadequate to assure that they would be able to quote Mt. Hood's service in the manner contemplated by the order.[22]

It was contended that Greyhound, by the acts of its agents, by refusing to take affirmative measures to cause its agents to comply with the order, and by taking action which was grossly inadequate to achieve full and accurate quotation of Mt. Hood's service, was willful disobedience of a lawful order of this court.

After carefully reviewing the evidence in support of these charges the court has come to the conclusion that Greyhound willfully violated Paragraphs 4 and 5. The evidence establishes beyond a reasonable doubt that Greyhound did not voluntarily and accurately quote joint through routes in connection with Mt. Hood and that Greyhound did not cease quoting Mt. Hood's service unfavorably or inaccurately in response to inquiries from the traveling public.

The principle evidence of violations of these provisions of the order is found in Exhibits B and E, attached to the affidavit of Bernard Gould, and in the Mt. Hood surveys, summarized in PX 20 (Donohue Exhibit A).[23] In the course of preparing surveys the ICC and Mt. Hood had to make certain judgments as to whether a particular quotation of service was or was not in compliance with the order. To evaluate the probative value of the surveys, it is important to know what would make a response "correct" or "incorrect".

The government stated that an agent's response was marked incorrect if the interline service with Mt. Hood would have been shorter, faster, cheaper, and/or more convenient than the best all-Greyhound routing.[24]

22. The government claimed that the directives:
 a. failed to state that Greyhound was under a court order to volunteer full and accurate quotations of the most convenient routes, even when the routes are those of Mt. Hood;
 b. suggested falsely that such quotations have always been Greyhound's policy;
 c. did not instruct the agent that the passenger should always be sent by the shortest route unless he requests otherwise;
 d. did not indicate that compliance with the directive would be policed by Greyhound;
 e. did not state that agents would be subject to discipline for failing to comply with the directive.

23. While the court is of the opinion that the results of Gould's ICC surveys (Exhibits B and E) are sufficient by themselves to support a finding of criminal contempt, Mt. Hood's surveys bolster the court's conclusions. From February 5, 1970 to August, 1971, Mr. Donohue made 316 telephone inquiries to which he received 239, or 75%, incorrect responses. These responses were deemed to be incorrect on the basis that Greyhound-Mt. Hood's joint service was not voluntarily and/or accurately quoted where it was faster, shorter, less expensive and/or more convenient. The record of the Donohue survey is embodied in Donohue Exhibit A "Summary of Incorrect Telephone Responses", PX 2001–2024 "Donohue Inquiries Correct", and PX 1001–1318 "Donohue Inquiries Incorrect".

24. See Criminal Contempt Petition ¶ 10. The government adopted almost the same standard in the Civil Contempt Petition ¶ 13: a response was marked incorrect if it was not "given voluntarily and/or it did not quote Mt. Hood's service when that service was the shortest, fastest, least expensive, and/or most convenient."

Greyhound objected to the government's standard, arguing that its use was not warranted by the terms of the order. Greyhound also contended that the government has not just one standard, but in fact has used many,[25] in effect adopting a "scattergun approach" of devising a series of different standards, each broader and looser than the next, in the hope of hitting as many agents' quotes as possible. Greyhound argued that the very number of different interpretations advanced under the umbrella of the order show that the government's purported standards lack the certainty and specificity required for a finding of contempt.

■■■■ While a *court order will not be expanded by implication or intendment beyond the meaning of its terms* in order to find the respondents in contempt, Terminal R.R. Ass'n. of St. Louis v. United States, 266 U.S. 17, 29, 45 S. Ct. 5, 69 L.Ed. 150 (1924), it may be read in light of the purposes for which it was entered and it is subject to a reasonable interpretation.[26] The ICC and Mt. Hood had to make a certain judgment in evaluating Greyhound's compliance effort. The only real question is whether the judgment exercised by the government is reasonable and the court concludes that it is. This standard provides an objective and consistent way for determining whether or not an agents' quote complied with the terms of Paragraphs 4 and 5. Furthermore, in this case the government's standard is appropos in light of the fact that in December, 1968, the ICC, in granting a motion by Mt. Hood, found it was an unreasonable practice for Greyhound to fail

"to require its agents to inform inquiring persons fully, accurately, and impartially of *shorter or faster or cheaper or equally desirable joint through routes and fares* . . ."[27] (Emphasis added).

As for Greyhound's criticism that the government is using a "scattergun approach of devising a series of different interpretations, each broader and looser than the next, . . ." the court cannot agree. While the form of the language used by the government in describing its measuring standard may vary slightly where it is mentioned in the briefs and petitions, the substance of the language remains the same. The court cannot discern any appreciable difference between the standard used in the criminal petition, or the one used in the civil contempt petition, or the standard used in Gould's affidavit. The court is of the opinion that the substance of the government's standard never varied. The government's overriding concern was:

(1) to see whether Mt. Hood's joint through routes were voluntarily and ac-

---

25. Respondents cite ¶ 13 of the Civil Contempt Petition which stated that a quotation of service was incorrect where Greyhound agents were not "quoting Mt. Hood's at all in response in requests . . . as to the shortest, fastest, and least expensive, and/or most convenient service available," and compared it with Exhibits B and E of Gould's affidavit, where Greyhound agents were charged with having quoted incorrectly when they did not quote what ICC attorneys thought was the "best service" (interpreted to mean a failure to voluntarily and correctly give information as to the availability of a joint route with Mt. Hood or as giving incorrect information detrimental to the traveling public). Also compared were glosses Donohue gave to the standard in his affidavit. Respondent's Brief 73.

26. Cf. John B. Stetson Co. v. Stephen L. Stetson Co., 128 F.2d 981, 983 (2d Cir. 1942):
"In deciding whether an injunction has been violated *it is proper to observe the objects for which the relief was granted* and to find a breach of decree in a violation of the spirit of the injunction, even though its strict letter may no have been disregarded." (Emphasis added).
To determine if "the spirit" of an injunction has been violated, some interpretations as to what the injunction was meant to accomplish would be required.

27. Report and order of ICC Hearing Examiner Winson, in MC–F–9136, Mt. Hood Stages, Inc., Petition for Modification, p. 48.

curately quoted, without geographical limitations, and

(2) to see that Greyhound ceased quoting Mt. Hood's service unfavorably or inaccurately, and from not quoting Mt. Hood's service at all in response to specific requests from the traveling public. The ICC and Mt. Hood surveys were the means used to check Greyhound's compliance effort. It was inevitable that during the course of that work certain value judgments would be made with regard to what was and was not a satisfactory quotation of Mt. Hood's service. The standard used by the government is a rational one in that it could be applied consistently and objectively to determine if Mt. Hood's service was being quoted in the manner contemplated by the order. The person making the inquiry for service could readily determine if the service quoted was the "shortest, fastest, least expensive, and/or most convenient service available". In short, the court is of the opinion that the standard used by the government was compatible with the terms of the order. Having made this determination, the court nevertheless feels compelled to discuss one other aspect of this problem.

Although Greyhound was extremely critical of the standard used by the ICC in measuring the correctness of a quote, Greyhound itself found it difficult to formulate a workable standard for measuring compliance. Greyhound's answer and depositions suggest that it advocates "totality of the circumstances" standard. Mr. Nageotte stated:

"I would have to know all of the circumstances—the time of day, specific request, desire of the passenger. All of these factors govern the kind of quotation which could be considered 'correct'." [28]

Greyhound stated in its response that so long as it

" . . . has taken reasonable and appropriate measures to cause its employees and independent commission agents to quote service as required by said Order, the Order is not violated by reason of errors and omissions by employee and independent commission agents such as occur in the usual course of business, or by reason of failures to quote services *which under the circumstances of the particular case*, an employee or independent commission agent may regard as not being in the passenger's best interest." [29]

If the court were to recognize this "totality of the circumstances" test as an appropriate standard for measuring the correctness of a quote, it would render the order practically unenforceable. As the government pointed out:

"*It would be virtually impossible to judge every compliance check in terms of whether 'under all the circumstances' it might have been 'reasonable' for the Greyhound agent to conclude that the shorter, faster PT service not quoted was not in the passenger's 'best interest' in that particular instance.*

"Interpreted as a single command to quote the passenger both services whenever the interline or through bus service with PT is shorter, faster, cheaper or more convenient, the Order is clear and enforceable. *Interpreted as Greyhound suggests, the Order becomes a mere vacuous admonition to be nice to passengers.* Such an emasculation of provisions 4 and 5 would serve Greyhound's purposes, but would leave the public and PT entirely at the mercy of individual Greyhound agents —hardly the intent of the Order." [30] (Emphasis added.)

Having decided this critical threshold question, the court may now consider the substantive evidence of violations

28. Nageotte Deposition 90.

29. Greyhound Response to Criminal Contempt Petition, ¶ 10, p. 6.

30. Government Brief 100.

presented in Exhibits B and E attached to the affidavit of Bernard Gould. This affidavit states that the ICC made an independent investigation to determine the degree of Greyhound's compliance after representatives of Mt. Hood and Greyhound met with him in Washington, D. C., on May 26, 1970. On June 2, 1970, Gould ordered that the ICC's Bureau of Operations initiate an investigation. Fourteen field representatives of the ICC conducted 80 inquiries at 38 Greyhound terminals in the western United States. A review of Exhibit B reveals that in only 31 out of the 80 inquiries did the Greyhound agent voluntarily and correctly give information as to the availability of a joint route with Mt. Hood; this meant that Greyhound quoted correctly 39% of the time and incorrectly 61% of the time.

On August 11, 1970, Gould ordered that a limited ticket survey be conducted at the general office of Greyhound's Western Division in San Francisco, to determine whether Greyhound was continuing to route passengers to points in eastern and central Washington circuitously via Portland. The results of this study are shown in Gould's Affidavit Exhibit C and they indicate that the majority of passengers destined to or leaving the eastern or central part of Washington for points in California were still being routed via Portland on the longer and slower all-Greyhound route rather than by the faster joint route with Mt. Hood.

The study that Gould ordered in August, 1970 involved the examination of all tickets issued at Greyhound's Fresno terminal in March, April and May, the three months immediately after the issuance of this court's order. The survey specifically showed that 4631 tickets covered destinations in eastern and central Washington and that *all* were routed via Greyhound's Portland gateway rather than interlining at Klamath Falls, Ore-

gon with Mt. Hood. Besides its own study, the ICC obtained copies of a traffic survey conducted by Greyhound itself. Greyhound's study, which is shown attached to Gould's Affidavit as Exhibit D, conducted for a similar period, confirmed by ICC's finding that a majority of passengers between eastern Washington and California were still being routed via Portland.

The relation between the ICC 1970 traffic survey, see Gould Affidavit, Exhibit B, and the passenger destination studies obtained from Greyhound is critical. The latter corroborates the findings that quoting violations occurred at major Greyhound terminals and that such practices caused large numbers of passengers to be routed via Portland rather than being sent the more direct interline routes with Mt. Hood.

Considering that these events took place in the few months immediately following the order, one could be charitable to Greyhound and excuse the apparent failure to quote according to Paragraphs 4 and 5, and the consequent long-routing of passengers on the basis that it would take some time for Greyhound to alter the past quoting habits of its agents. Also, the joint through-bus was not reinstated until April, 1970, which means that part of the ICC survey was conducted at a time when the all-Greyhound route was the only available service and therefore, the best. However, Mt. Hood continued to monitor Greyhound's quoting practices in the months that followed and in October, 1970 Mt. Hood sent abstracts of its survey to the ICC which indicated that Greyhound agents were still not complying with the injunction. Gould also testified that at least three times during early 1971 the ICC Bureau of Enforcement received copies of evidence of non-compliance by Greyhound submitted by employees of Mt. Hood to the Department of Justice.

31. It should be noted that the joint through bus was not reinstated until April, 1970. This fact would explain why the figure for this period shows all traffic moving over the Greyhound route.

In July, 1971, Gould directed the ICC's field staff to conduct an additional telephone survey of Greyhound's agents' compliance with the provisions of Paragraphs 4 and 5, in order to determine independently whether the violations the ICC field staff had discovered in the summer of 1970, and which Mt. Hood officials later had advised were taking place, were in fact still continuing. The summary of that survey appears as Exhibit E (attached to Gould's Affidavit) and discloses that *even after the filing of the contempt petitions* in June, 1971, Greyhound agents gave incorrect information detrimental to Mt. Hood and to the traveling public in nearly 51% of all instances surveyed.

While one would not expect Greyhound's quoting to be 100% accurate, the fact that there continued to be inaccurate and incorrect quoting, as judged by the standards heretofore discussed, on nearly 51% of the inquiries is sufficient to support a finding of criminal contempt. This conclusion is based upon the fact that Greyhound's quoting violations continued at about the 51% level in the year between the ICC's initial inquiry (in March, April, and May, 1970) and the last survey in July, 1971. By this time Greyhound certainly could have been expected to have reduced the quoting errors to a negligible level, but the results of the 1971 ICC survey suggests that Greyhound did little toward that end.

If further corroboration of the ICC study of 1971 is needed, it can be found in a Greyhound passenger destination study obtained as part of the discovery in the contempt cases. See BC-32. The Greyhound study covered a six month period from March to August, 1971. The results of this survey reveal that of 124 passengers traveling from Fresno to points in central or eastern Washington during the six-month period, 113 were routed the long way through Portland, Oregon, rather than by the joint route with Mt. Hood through Klamath Falls.

Eleven passengers were routed via Mt. Hood. When this data is combined with the fact that on 27 separate instances, the agency at Fresno responded to ICC or Mt. Hood inquiries by failing to quote shorter or faster Mt. Hood service to Yakima, Washington and other points north east of Portland, it becomes clear that Greyhound's quoting violations at Fresno have a major effect on the actual routing of traffic.[32]

A similar high correlation between quoting violations by Greyhound and routing of passengers via Portland was noted at Greyhound's Los Angeles terminal. Mr. Everett Croes, Greyhound's regional manager at Los Angeles for the area including southern California, testified that he was aware that the through-bus is more than two-and-one-half hours shorter than any all-Greyhound service from Los Angeles to Spokane. He further testified that the 1:00 p. m. departure time is a good departure time for what is a fairly long journey, especially in light of the arrival time at Spokane. Croes concluded by stating that if all the alternatives of the through-bus, the joint-through bus, and the all-Greyhound schedules were quoted fairly in Los Angeles, a substantial percentage of passengers from Los Angeles to Spokane would travel on the through route.[33]

However, a *Greyhound* passenger study for the six month period March through August, 1971 revealed that of 295 passengers from Los Angeles to points in central and eastern Washington, 254—or nearly 90%—were routed via the longer, slower, all-Greyhound route through Portland, and only 31 were routed via the Greyhound-Pacific Trailways through-route, BC-32.

The disturbing fact is that, although this and other passenger studies conducted by Greyhound revealed a large amount of long-routing of passengers, and thus suggested that adequate quotation of service was not occurring, it does not appear that Greyhound ever used its

32. BC-32, PX 20, Gould Exhibits B and E.

33. Croes Deposition 49–59.

destination studies in furtherance of a compliance program. The reason for this large diversion of passengers over the longer, slower, all-Greyhound route is not difficult to find. The record in this case includes 30 different instances during 1970 and 1971 in which ICC or Mt. Hood investigators uncovered quoting violations at the Greyhound Los Angeles Terminal.[34]

ICC and Mt. Hood investigators also discovered over 100 instances in which Greyhound agents failed to quote Mt. Hood's service adequately over east-west routes from points in western Oregon to eastern points, where the Mt. Hood service would have provided the most direct, fastest, and/or cheapest service. When Mt. Hood examined Greyhound tickets to and from the relevant points for the period of May through August, 1971, it was discovered that 918 passengers, over 55% of those traveling between points where Mt. Hood provides the most direct service, were routed the long way on all-Greyhound routes through Portland, Oregon.[35] This separate, extensive ticket analysis corroborates the conclusion of the ICC and Mt. Hood telephone checks that quoting violations were occurring with great frequency.

■ Greyhound contends that the government's numbers, and its facile conclusions, will not withstand scrutiny. Greyhound asserted that the Exhibits B and E reflect the judgment of an ICC attorney as to whether in each particular case the agent quoted the "Best Service". It was argued that the standard of "Best Service" is far too vague and uncertain to constitute a basis for a finding of contempt. This argument however, ignores the fact that Mr. Gould interpreted the standard, thus giving it objective content. Gould stated that response was marked incorrect when an agent failed to

"voluntarily and correctly give information as to the availability of a joint route with Pacific Trailways . . . ." or when an agent gave

"incorrect information detrimental to Mt. Hood and to the traveling public." [36]

Furthermore, a careful examination of the numerous documents (PX 3001–3080 and PX 3501–3618) that formed the basis for Exhibits B and E reveals that "Best Service" is a shorthand expression for that service which in any given instance would be "the shorter, faster, cheaper, and or most convenient service available." This standard was used in the Criminal and Civil Contempt Petitions and the court already has found that the use of this standard was reasonable.

As for Exhibit B of the Gould Affidavit (1970 Inquiries), Greyhound states that out of 42 inquiries relevant to the joint through route, 17 (40%) of the responses are conceded by the government to be correct. Greyhound then analyzed 16 additional quotes to show that they were not totally incorrect quotes of joint through service; Greyhound did concede that 9 (21%) of the responses were clearly wrong.

As for Exhibit E of the Gould Affidavit (1971 Inquiries), Greyhound notes that out of a total of 67 inquiries relevant to the joint through route, 37 (55) of the responses are conceded by the government to be correct. Greyhound briefly describes why 15 of the inquiries, marked incorrect by the government, were at least questionable, and finally concludes that only 15 (22%) quotes were wrong in that they failed to quote Mt. Hood's service. This, Greyhound concludes, is not evidence of contempt.

■ However, Greyhound's analysis of Exhibits B and E ignored other evidence of violations. Greyhound chose to discuss alleged violations pertaining only to the joint through-route (Spokane to San Francisco) and did not give any con-

34. PX 20 and Gould Exhibits B and E.
35. See HD–D–5.
36. See Gould Affidavit 4 and 8.

sideration to alleged violations pertaining to other routes where there was Greyhound-Mt. Hood *interline* service. Instead, Greyhound took the position that it was not obligated by Paragraph 4 to quote this service. For example, Greyhound framed its analysis of Exhibits B and E only in terms of numbers of inquiries "relevant to the joint through-route." In discussing Exhibit B, Greyhound analyzed only 42 inquiries out of a total of 80. And in discussing Exhibit E Greyhound analyzed only 67 inquiries out of a total of 117, see Respondent's Brief pp. 78–79. The inquiries not discussed by Greyhound (38 from Exhibit B and 50 from Exhibit E) pertained to alleged violations which occurred in the quotation of service that was not on the San Francisco-Spokane joint through-route, but rather involved Greyhound-Mt. Hood interline service that provided a convenient and practical alternative to an all-Greyhound route. These alleged violations must be considered by the court, even though Greyhound has chosen to ignore them. Paragraph 4 required that Greyhound "voluntarily and accurately quote joint-through *routes* in connection with Mt. Hood, without geographic limitations, in a manner fully responsive to inquiries from the traveling public." The history of this litigation supports the proposition that Paragraph 4 contemplates that in all cases where there is a Greyhound-Mt. Hood interline route that provides a convenient and practical alternative to an all-Greyhound route, the passenger should be informed of both available services and allowed to choose the service that best suits his needs.[37] The court does not mean to imply that Greyhound must encourage a passenger to travel by an interline route. However, the court is of the opinion that Paragraph 4 was intended to require Greyhound to provide the customer with sufficient objective facts concerning times, fares, route and distances so that he could make a free and informed choice between traveling an all-Greyhound route or on a Greyhound-Mt. Hood joint through route or interline route.[38]

Greyhound interpreted Paragraph 4 as requiring only the quotation of the joint through route and not the quotation of Greyhound-Mt. Hood interline service. This would mean that Greyhound would only have to quote the joint through service from Spokane to San Francisco via Mt. Hood's route from Klamath Falls and The Dalles. Greyhound relied on Thompson v. United States, *supra,* in which the Court established the test for a through route, to support its position that the joint through fare interline routes with Mt. Hood are not joint through routes within the meaning of Paragraph 4.

Having considered at some length the arguments presented, the court is of the opinion that Greyhound's position is untenable. Under *Thompson,* "the test of the existence of a 'through route' is whether participating carriers hold themselves out as offering through transportation service," *supra,* note 38.

37. See Report of Examiner Winson, Mt. Hood Stages, Inc. Petition for Modification, MC–F–9136, pp. 47, 53, and 57; Report of ICC on Greyhound's Petitions for Modification, MC–F–9136, pp. 3–4.

38. The differences between a joint through route and interline service should be noted. In Thompson v. United States, 343 U.S. 549, 557, 72 S.Ct. 978, 983, 96 L.Ed. 1134 (1952), the Court stated that "the test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service." Through service contemplates continuous transportation on *one* carrier over routes of two or more carriers; no change of equipment is involved. On the other hand, interline service involves a situation where a carrier, whose routes do not reach the passengers' destination point, transports the passenger as far as it can on its own route. The passenger is then transferred to another carrier for transportation to the final destination. *Cf.* Gilbertville Trucking Co. v. United States, 371 U.S. 115, 121, n. 2, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962). A joint through route and interline service are *not mutually exclusive.*

The Court noted that to bring a through route into existence, some kind of "an arrangement, express or implied, between connecting carriers," is required. In this case there was "an arrangement, express or implied" between Mt. Hood and Greyhound to bring a through route into existence. Greyhound admitted that "joint through fares are, and for many years have been published . . . on the lines of P.T. and Greyhound, . . ."[39] The establishment and maintenance of joint through fares is an arrangement that would bring about a joint through route, as contemplated in *Thompson*. See Freight, All Kinds, Chicago, and Ind., Mich., Ohio, 322 ICC 423, 428 (1964). Another type of arrangement that existed between Greyhound and Mt. Hood was noted in ICC Examiner Winson's report. He found a Greyhound bulletin which stated that:

> "[f]or a number of years, we have had an *arrangement* with Pacific Trailways whereby tickets of their issue reading between points served by Western Greyhound Lines may be honored for transportation whenever they are presented, regardless of the specific routing shown on the ticket.[40]
>
> (Emphasis added.)

Thus, Greyhound's statement that:

> "Only the joint through service between Spokane and San Francisco can be regarded as a joint through route of PT and Greyhound. No other arrangement for or holding out of through transportation service between the carriers exists",[41]

is patently wrong. The joint honoring arrangements that Greyhound maintained with Mt. Hood and the maintenance of joint through fares is directly contrary to any such contention.

Finally, it should be noted that Paragraph 4 speaks ·of joint through *routes*.

Note the plural on "route." Surely the word "routes" contemplates that more than one route was to be quoted, and not just the San Francisco-Spokane joint through route.

Greyhound attempts to prove that its agents did not violate Paragraphs 4 and 5 of the order by devoting an entire Appendix (D) of its brief to an analysis designed to prove that most of the ICC checks marked "incorrect" were not in violation of the order. It answered the evidence of violations compiled by Mt. Hood with a brief comment in a footnote.[42]

▮ Besides its general argument that it is not required by the order to quote any service except that San Francisco-Spokane joint through bus, which the court has rejected, *supra*, Greyhound makes five principal criticisms of the ICC's 1970 and 1971 surveys.

**(1) *Terminal changes.***

Greyhound attempts to justify its agents' failure to quote joint through routes with Mt. Hood in 14 instances on the ground that a passenger would have to change terminals, either at Portland within a ten minute period, or at Salt Lake City within a thirty minute period.[43] Yet in both cities the Greyhound and Trailways terminals are fairly close. As indicated above, the order was designed to compel Greyhound to quote all available service to a given point in situations where there is a Greyhound-Mt. Hood interline route (or joint-through route) that provides a convenient and practical alternative to an all-Greyhound route. The passenger should be informed of both available services and allowed to choose the service that best suits his needs. In the quotations under consideration here, the passenger should have the choice to change terminals at Salt Lake City or

---

39. Respondent's Answering Brief 105.

40. Report of Examiner Winson, *supra*, note 37, p. 34.

41. Greyhound Answering Brief 75.

42. See Greyhound Brief 79.

43. PX 3016, 3044, 3045, 3071, 3074, 3075, 3535, 3538, 3539, 3576, 3577, 3580, 3584, and 3607.

Portland. For example, in PX 3071, a request was made for a morning departure from Cedar City, Utah to Burley, Idaho. The agent quoted the all-Greyhound service and when asked about other service from Salt Lake City, she quoted Mt. Hood's service. In order to take the Greyhound-Mt. Hood route, a passenger would have to change terminals (four blocks) at Salt Lake City, and the schedule would allow the passenger ten minutes to do so. However, by traveling the Greyhound-Mt. Hood route a passenger will save two hours and thirty-five minutes in travel time, as opposed to the all-Greyhound route.

Greyhound would excuse its agents' failure to *voluntarily* quote the Mt. Hood service on the basis that the passenger would have an insufficient amount of time to make the depot change. However, Greyhound should inform the passenger of the options, and permit the passenger to make the choice. Secondly, Greyhound's rationalization in these Salt Lake City situations is shocking in light of its refusal to permit Mt. Hood into the Salt Lake City terminal, notwithstanding the fact that in December, 1968, the ICC ordered Greyhound to permit Mt. Hood's buses into that terminal. This certainly seems to confirm the government's original charge of criminal contempt that Greyhound was and is using its own refusal to allow Mt. Hood buses into the Greyhound Salt Lake City depot as an alibi for its agents' failure to quote shorter or faster interline service with Mt. Hood.

#### (2) *Parallel Routes*

Greyhound attempts to justify its failure to quote joint through routes with Mt. Hood voluntarily or accurately in sixteen instances [44] on the basis that Mt. Hood and Continental Trailways provide parallel and competitive service and that the order does not require this service to be quoted. However, an examination of several exhibits involved indicates that a passenger from Seattle, for example, may save many hours by traveling a Greyhound-Mt. Hood interline route as opposed to an all-Greyhound route. But, unless the passenger is fully informed of the alternative schedules, he would not be able to make an informed decision about which schedule would best suit his needs. A person may be willing to transfer terminals in order to save several hours of travel. For example, in PX 3009, Mr. E. J. Casey, a Mt. Hood District Supervisor in Seattle, Washington, requested a morning departure from Seattle to Boise, Idaho. The agent quoted an all-Greyhound route that would take nineteen hours and ten minutes. The agent said there was no joint service to Boise. However, if the agent had been quoting in accordance with the requirements of the order, she would have also quoted a Greyhound-Mt. Hood interline schedule from Seattle to Boise via Portland, that would take one hour and forty-five minutes *less* to travel for the same fare. This is only illustrative of the type of quoting that was given by Seattle Greyhound agents.

In the 1971 ICC Survey, PX–3581 reveals that on July 14, 1971, Mr. Casey telephoned the Greyhound depot at Tacoma, Washington, and requested a departure for the morning of July 15 from Tacoma to Boise. The agent quoted an all-Greyhound route which had a total traveling time of eighteen hours and fifteen minutes, with a two and one-half hour layover. The agent could have quoted a Greyhound-Mt. Hood joint route between Tacoma and Boise that would have taken three hours and fifteen minutes *less* time to travel.

While the routes in question may be competitive and substantially parallel, Paragraph 4 of the order imposed upon Greyhound a duty to quote these joint routes with Mt. Hood. To permit Greyhound to avoid its obligations under this paragraph would in effect give it a license to destroy its only competitor in

---

44. PX 3009, 3010, 3011, 3012, 3013, 3014, 3026, 3027, 3560, 3561, 3566, 3576, 3577, 3579, 3580, and 3581.

the Pacific Northwest area. It should be emphasized that Paragraph 4 does not require Greyhound to promote traffic or encourage passengers to travel over Mt. Hood's routes. All that Greyhound must do is fully inform the traveling public of the alternative routes available so that the passenger can make up his own mind. A passenger may prefer to ride a longer all-Greyhound route because he may not want to change to Mt. Hood's buses or terminals at a given point. But unless Greyhound informs the passenger of the various route alternatives, the passenger cannot make a fully informed choice. And it was the purpose of these paragraphs to compel Greyhound to accurately and voluntarily quote *all* available service to a given point so that the passenger could make an informed decision on which service best suited his needs.

(3) *Meal Stops*

Greyhound attempts to justify its agents' failure to quote joint through routes with Mt. Hood voluntarily or accurately in seven instances on the grounds that "no meal stops" for varying periods of time were involved.[45] However, in four of those instances the service to have been quoted was overnight. In PX–3607, Greyhound claimed there are no meal stops for twenty-seven hours, yet the entire trip involved only fourteen and three quarters hours, and saved two hours and forty minutes (including six rest stops). Even conceding Greyhound is correct in three instances, the "no meal stop" rationalization is insufficient to erase the large record of quoting violations documented by the ICC.

(4) *Next Bus Out*

Greyhound attempted to justify some of its agents failure to voluntarily or ac-

curately quote joint through routes with Mt. Hood that were several hours faster than the all-Greyhound service on the grounds that its agents quoted the all-Greyhound service since it was the "next bus out."[46]

However, there is no indication that the inquirer, who was calling on the telephone, not appearing in person, asked for the "next bus out."[47] When the inquirer asked for service faster than that quoted the following were typical replies: "This is real fast service" (PX 3041); "Not to my knowledge" (PX 3041); and the Greyhound service is "the shortest traveling time" (PX 3072). The next bus out rationalization is an insufficient ground on which to excuse the agent's failures to quote relevant Mt. Hood service.

Greyhound also attempted to excuse a number of failures to quote relevant Mt. Hood service on the ground that its agents and information clerks are unfamiliar with small towns such as Toppenish, Pasco, and Wenatchee.[48] Yet, there were hundreds of instances in which Greyhound agents failed to quote shorter, faster, and more convenient Mt. Hood service to major cities such as Spokane, Yakima, Boise, and Salt Lake City.[49]

(5) *Circuity*

Finally, Greyhound defends fifteen failures to quote on the grounds that the all-Greyhound route over which the passenger was sent was only five to eight percent longer or slower than the interline service about which the passenger was kept ignorant. It is then contended that this is unobjectionable because the ICC has always tolerated a limited degree of circuity in routing.[50] However, the ICC law relied upon by Greyhound [51]

---

45. PX 3024, 3074, 3576, 3577, 3580, and 3607.

46. See PX 3004, 3041, 3072, 3073, 3542, and 3546.

47. The inquirer in PX 3542 asked for a *"night"* bus.

48. Answering Brief 82.

49. Government Brief 93–95.

50. Answering Brief 62; Answering Brief Appendix D, pp. 6–16.

51. See Respondent's Answering Brief p. 62 (fn.).

deals with transport of freight (not passengers) and with the right of a carrier to deviate from its own routes. It has no relation to the duty of a carrier to quote joint through routes with another carrier. In this case Greyhound's duty to quote Mt. Hood's service is dictated by its representations before the ICC and by the orders of the ICC and this court. The fact that an all-Greyhound route may only be five to eight percent circuitous is no excuse for Greyhound's failure to quote relevant Greyhound-Mt. Hood interline service.

After carefully reviewing Exhibits B and E and the respondent's arguments in defense of the charges, the court is compelled to conclude that Greyhound willfully failed to comply with the terms of Paragraphs 4 and 5. The fact that the ICC was able to document a rate of quoting error of 51% seventeen months after the order was effective is more than sufficient evidence to support a finding of criminal contempt. The element of willfulness required for a finding of criminal contempt is supplied by the fact that Greyhound failed to take meaningful corrective steps once it was informed [52] that its agents were being monitored and that a high rate of error was being reported. The court's conclusion is bolstered when one evaluates the ineffectual compliance program that Greyhound promulgated, discussed below.

In addition to the ICC's survey and findings, the court had before it Mt. Hood's survey, which documented a quoting error rate of about 75%. Greyhound's attempts to minimize the import and impact of these surveys are simply insufficient. After being confronted with substantial evidence of non-compliance, Greyhound tried to rationalize the "incorrect" responses with whatever excuse imaginable, in an effort to reduce the percentage of quoting error to a tolerable level.[53] But Greyhound's clever rationalizations will not erase the overwhelming record of non-compliance presented to the court by the ICC and Mt. Hood.[54]

Before considering the last charge of contempt for violations of Paragraphs 4 and 5, the court must briefly mention one additional point raised by Greyhound. Greyhound stated that there is no evidence of a single instance in which a Greyhound agent quoted Mt. Hood's service "unfavorably or inaccurately" or in which Mt. Hood's service was not quoted "at all in response to specific requests." The surveys speak for themselves. They are replete with instances in which Greyhound failed to quote Mt. Hood's service accurately and favorably. Paragraph 4 required Greyhound to quote Mt. Hood's joint through routes voluntarily and *accurately*. Paragraph 5 required Greyhound to cease and desist from quoting Mt. Hood's service *unfavorably and inaccurately,* in response to inquiries from the traveling public. The court has already found that Greyhound did not conform with Paragraph 4 in that Greyhound did not voluntarily and *accurately*

52. At the meeting May 26, 1970, with ICC Director Gould, Greyhound was presented with a record of over 100 more PT telephone checks revealing a failure to adequately quote Mt. Hood's service. At the same meeting Gould warned Greyhound that the ICC would conduct its own investigation, which it later did. The results of those surveys are Exhibits B and E.

53. Cf. United States v. Kroger Grocery and Baking Co., 162 F.2d 168, 177 (7th Cir. 1947): "Certainly 100% compliance could not be expected in any event;"

54. It is interesting to note that Greyhound dismissed with a footnote the fact that Mt. Hood's survey showed that out of 410 telephone checks, it received over 310 incorrect quotations of service. Greyhound asserted, without proving, that Mt. Hood's telephone checks would be subject to the same technical criticism or excuses as Greyhound was able to formulate in regard to the ICC survey, Answering Brief 79. Yet when Greyhound deposed Donohue and Allen of Mt. Hood, it was able to take issue with only a handful of their telephone checks. See Donohue Deposition 70, 74, 78, 79, 82.

quote Mt. Hood's joint through routes. Having made that finding it necessarily follows that Greyhound was quoting Mt. Hood's routes unfavorably and *inaccurately*. For Paragraph 5 is, in part, a corollary of Paragraph 4. If there was a willful failure to comply with Paragraph 4, there necessarily was a willful failure to comply with Paragraph 5.

Secondly, Greyhound argued that the existence of error and imperfection in quoting afford no ground for a finding of contempt. This is said to be particularly true in this case where, west of the Mississippi River, Greyhound has some eight hundred employees and two thousand commission agents engaged in quoting service to the public. In support of its argument Greyhound cites United States v. Kroger Grocery and Baking Co., 163 F.2d 168, 177 (7th Cir. 1947):

> "Certainly 100% compliance could not be expected in any event; in fact, it would be impossible. Just what degree of compliance could reasonably be expected from a concern of the magnitude of defendant with its 122 meat markets carrying from 250 to 300 separate items of meat, relying solely upon several hundred employees in making its sales, might be a matter of opinion, but undoubtedly many unintentional errors could reasonably be anticipated. The most that the record shows in this case is that such errors occurred. It does not follow, however, that they were made deliberately and intentionally."

As will be shown in the next section, Greyhound's reliance on *Kroger* is entirely misplaced. For the record in this case shows that not only did the errors occur, but, when one considers the inadequate measures Greyhound took to achieve compliance, it was almost inevitable that errors would occur.

## GREYHOUND'S COMPLIANCE PROGRAM

The government has charged that Greyhound violated Paragraphs 4 and 5 of the order by issuing directives to its agents that were grossly inadequate in that such directives: (a) failed to state that Greyhound was under court order to volunteer full and accurate quotations of the most convenient routes, even when those routes are those of Mt. Hood; (b) suggested falsely that such quotations were always Greyhound's policy; (c) did not instruct that the passenger should always be sent by the shortest routes unless he requested otherwise; (d) did not indicate that compliance with the directive would be policed by Greyhound; and (e) did not state that agents or commission agents who failed to comply with the directive would be disciplined. The government concluded that Greyhound, by its own refusal to take affirmative measures to achieve compliance with the order, and by taking insufficient action to achieve full and accurate quotation of joint routes, knowingly and willfully disobeyed the order.

Greyhound stated that its program of achieving compliance through its employees and agents did not lend any support to the government's contempt charges. Greyhound took the position that the government's charges were not based upon any violation of the order and are criticisms unrelated to the terms of the order.

Initially the court must consider whether a criminal contempt can be predicated upon these charges, for the order did not specifically require Greyhound to do the things that are now charged as contempt. Once the order was entered Greyhound was left to its own devices with regard to just how compliance would be achieved. The real issue presented by the charges is whether Greyhound, and its top officials, took all reasonably necessary steps to insure compliance with the court's order.

The respondents in the criminal contempt petition are the Greyhound Corporation and Greyhound Lines, Inc. The law of corporate responsibility makes it clear that a corporation can be held responsible for the acts of its agents, Wil-

son v. United States, 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Parker v. United States, 126 F.2d 370, 379 (1st Cir. 1942). In this case, the violations of Paragraphs 4 and 5 were committed by Greyhound ticket agents. The extent to which Greyhound will be held accountable for the acts of these agents is dependent upon the nature and extent of the efforts that Greyhound made to achieve compliance with these Paragraphs 4 and 5. Consideration of two cases will be most instructive in determining Greyhound's liability for criminal contempt based upon their compliance program. In United States v. Kroger Grocery and Baking Co., *supra*, the court reversed the criminal contempt conviction of the Kroger Company, despite proof that some Kroger employees had in fact sold food at prices higher than the OPA regulations permitted. The court took particular note, at 170–175, of the following facts:

1) There was no evidence even suggesting that the acts were intentional.

2) There was no evidence connecting upper management of the company to the violations.

3) Management had informed every employee of the applicable regulations to be obeyed.

4) The company's directives made clear that violation of the regulation could result in punishment.

5) Kroger employed an independent shopping service which checked 4400 transactions to determine the extent of the problem, and which reported 448 overcharges to management.

6) Every employee found to have committed a violation was warned that any repetition of such conduct would result in discharge.

7) Neither the prosecution nor the District Judge could "point out what more the defendant could have done to impress upon its employees its honest and good faith effort to comply with the ceiling prices."

It was the court's careful consideration of the above factors which led to the reversal of Kroger's conviction.

The situation in *Kroger* invites comparison with In re Holland Furnace Co., 341 F.2d 548, 551 (7th Cir. 1965), cert. den. 381 U.S. 924, 85 S.Ct. 1559, 14 L. Ed.2d 683 (1965). Here, the company and several of its officers were found guilty of criminal contempt. The company was fined $100,000 and its chief executive was sentenced to six months in jail. The evidence justifying the criminal contempt fine on the company was the behavior of its salesmen in continuing to make misrepresentations of the type forbidden by the orders of the F. T.C. and Seventh Circuit. The court based its findings of criminal contempt upon the following facts:

1) The company had a previous history of violations.

2) The original illegal policies were directly attributable to the intentional policies of the top management of the company.

3) Management pursued a course of conduct designed to construct an apparent compliance with the order and to devise a defense against charges of violations.

4) Management appointed a man to supervise compliance whom it knew would not be effective in investigating complaints and disciplining the sales force.

5) The company's bulletin concerning compliance carefully avoided the word 'discharge' and the bulletin was ineffective to influence radical changes in Holland's sales, even if it reached the salesmen.

6) Top management made no substantial change after the date of the order in Holland's sales practices or in the fundamental structure underlying the practices.

7) Top management's unbending attitude toward the commissions cease and desist order and confidence in

eventually setting it aside were an obstruction to change and compliance with court's order.

The parallels in the case before the court to the facts of *Holland Furnace* are as striking as they are to the contrasts with *Kroger*: The analogies drawn in the Government's Brief aptly illustrate the parallels and contrasts:

"This is not a case of a first offense, as in *Kroger*, but involves further violations by an old offender, as in *Holland Furnace*.

"The multiple failures to quote at certain terminals, combined with previous instructions to agents to 'hold all traffic to Greyhound' and continuing management recalcitrance to quote over certain routes indicate that many of the failures to quote PT have been intentional and deliberate. The failures to tell agents about the Court's decision and Order, to threaten or impose discipline, to distribute bulletins or to conduct phone checks nationwide, etc., were obviously and admittedly deliberate and intentional.

"In this case, like *Holland Furnace* and unlike *Kroger*, the offensive policies were created by top management. The person most responsible for the policy of not routing traffic via Pacific Trailways was F. W. Ackerman, then President of Pacific Greyhound. The decision not to restore the through-bus after the 1964 Pacific Trailways strike was also directly attributable to Ackerman, then chairman of the board of Greyhound Corporation. (PX 1) Trautman, then vice-president and general counsel of Greyhound, now chairman of the board, rendered the crucial advice in 1964 that Greyhound's representations at the merger proceedings should not inhibit it from cancelling the through-bus. (GHT–B; Trautman 15).

"In *Kroger*, 4400 checks by management revealed 448 violations, suggesting that violations were the exception. In this case, there were over 420 quotation violations revealed by 600 checks, suggesting strongly that at many Greyhound agencies failure to quote PT service was the rule rather than the exception.

"In contrast to Kroger's management, which hired an independent concern to make 4400 shopping checks of its employees, which kept precise records of how many violations were found, and which corrected each violation by threatening to discharge the employee involved in the event of repetition, or actually discharging those who had no explanation, Greyhound relied on its own employees to police each other, gave no specific instructions on how policing was to be handled, kept almost no organized records of how many violations were found, and refrained from any threat or imposition of punishment. Greyhound field representatives supposedly made on-the-spot corrections, the content of which is unknown even to higher Greyhound executives (e.g. Croes 39).

"Although Kroger management sent a copy of the OPA regulations to each establishment and required that it be posted prominently, Greyhound did not send the text of the court order to its depots, nor tell its agents that the company was subject to a court order, until months after the contempt action was begun.

"Although the Kroger directive to employees stated expressly that violation of the OPA regulations could result in discharge, Greyhound, like Holland Furnace Corporation, 'carefully avoided the word discharge' in its bulletins, and refrained from any threat of discipline.

"In this case, as in *Holland Furnace*, top management made no substantial change after the date of the order in the basic sales practices of the company. *When specifically asked in an interrogatory what changes in quoting competitive service it had made since 1968, Greyhound replied that it had made none.* (PX 14).

"In this case, as in *Holland Furnace,* 'top management's unbending attitude toward the Commission's cease and desist order' was 'an obstruction to change and to compliance with the court's order.' Trautman, Greyhound's chief executive, reiterated in October of 1971 his fundamental disagreement with the findings and conclusions of the ICC. (Trautman 16) Trautman stated further that even in light of the ICC and PT exhibits to the contempt petitions regarding Greyhound agents' failure to quote as required, 'I have no evidence to this day that they have failed . . .' (Trautman 9) Convinced of its own righteousness, Greyhound saw no reason to even inform its agents about the ICC or three-judge court decisions or to provide agents with the text of the various orders. In its Response and in the depositions, Greyhound continued to assert its right not to quote relevant PT service in many situations covered by the Order. These attitudes were 'an obstruction to change and to compliance with the court's order.'[55]

The contrasts to *Kroger* and the similarities to *Holland Furnace* presented above speak very effectively for themselves. Greyhound's compliance effort was so deficient that it made this contempt proceeding inevitable. All of the deficiencies in Greyhound's compliance program charged by the government as contemptuous most certainly lead to Greyhound agents' failure to adequately quote Mt. Hood's service. Perhaps the most glaring defects in the Greyhound program were: (1) the failure of Greyhound to set forth in its bulletins that it was under a court order to volunteer full and accurate quotations of the most convenient routes (even when those routes are those of Mt. Hood); (2) the failure of Greyhound to adequately police the agents who were making the quoting violations; and (3) the failure of Greyhound to state that those who failed to comply would be subject to discipline.[56] Measures like these would have impressed upon Greyhound's agents the importance of complying with the order. One can only speculate on how effective these measures would have been, but there is no speculation as to the fact that a full 17 months after this order was entered, Greyhound's agents continued to quote in violation of the order 51% of the time. This is a strong indication that Greyhound's efforts to get its agents to comply with the order were deficient. Whatever steps Greyhound took to impress upon its employees their obligations under the order, those steps were obviously not adequate. The court is aware that the order did not specifically command Greyhound to issue a certain kind of bulletin or to police compliance in a particular way, but Greyhound had an obligation to provide full and prompt compliance by whatever means it felt were appropriate. Having chosen to conduct itself in the manner that it did, Greyhound must bear responsibility for the failure of that method to achieve compliance with the order.

Having made these findings, the court nevertheless feels compelled to discuss several matters raised by Greyhound in its brief, with respect to its compliance efforts.

Greyhound states that it began issuing bulletins to its agents in July, 1969, shortly after the ICC order and about 7

---

55. Government's Brief 143–146.

56. That Greyhound knows how to impress its employees with the importance of complying with court orders is clear from a bulletin it issued in January 1970, involving a 1957 court order. The bulletin concluded by stating:

"Any intentional violation of the Antitrust laws or of our Antitrust decree by any employee will be considered an act of disloyalty to Greyhound Lines-West and will be dealt with accordingly." (GHT–C)

No bulletin issued in connection with this order ever included a similar warning and Mr. Trautman stated that he would not approve such a warning in bulletins relating to this order.

months before this court's order, instructing them to quote not only the joint through bus, but also interline service with Mt. Hood whenever it was offered between two points. The government referred to only five bulletins, but in fact, between July, 1969, and November, 1971, at least nine bulletins were issued to agents instructing them to quote Mt. Hood service.[57]

In September, 1971, two months *after the contempt petitions were filed,* Greyhound again reminded agents of their obligations under the order and attached copies of the order and all of Mt. Hood's schedules to the bulletin.

Greyhound stated that its bulletins went far beyond the terms of the order in directing agents to quote *interline* service with Mt. Hood. Greyhound also contended the importance of the bulletins was clear from the frequency with which they were issued. Greyhound further emphasized the seriousness of its purpose by requiring agents to acknowledge receipt and understanding of bulletins which is not a normal procedure, and requiring District Sales Supervisors to contact agents personally to see that the bulletins were received, understood and followed, and to report that all contacts were made.

Greyhound further stated that the government was aware of the bulletins issued since July, 1969, but it never suggested to Greyhound any dissatisfaction with the bulletins until it filed the contempt petitions alleging that they were "grossly inadequate."

Greyhound also stated that its program for instructing agents was tailored to the realities of the situation. Thus, rather than issuing a copy of the ICC or this court's order to its agents, and rather than threatening and punishing agents for failure to comply with the bulletins, Greyhound required that the agents who would be most directly involved submit direct acknowledgments of

bulletins. Bulletins issued to agents less likely to encounter passengers who could use Mt. Hood's service were acknowledged by supervisors. Agents far removed from Mt. Hood's operations were provided information on Mt. Hood's services in the revised Greyhound tables and maps in *Russell's Guide.*

Of course, the government would not know how inadequate the bulletins were until they obtained the evidence of noncompliance in July, 1971. Only then could the government decide that the bulletins were "grossly inadequate." Compliance with the order was primarily Greyhound's responsibility. It had to take the steps necessary to achieve compliance. And if the steps Greyhound took were not adequate, as they obviously were not, then it must suffer the consequences. The record in this case has shown that Greyhound was advised by the ICC (and Mt. Hood) that its compliance with Paragraphs 4 and 5 was not satisfactory. Greyhound knew its agents were being checked by the ICC. The ICC surveys illustrate that regardless of the number of bulletins Greyhound sent to its employees and agents, their message was not coming through. If the bulletins were doing their job, one would expect that Greyhound could have reduced the level of quoting error documented by the ICC and Mt. Hood to a negligible level. But as shown above, the ICC's 1970 Survey (Exhibit B) documented a rate of error of *61%* and the ICC's 1971 Survey (Exhibit E) documented a rate of error of 51%. These surveys illustrate just how inadequate the bulletin and acknowledgment program was to achieve compliance.

As for Greyhound's telephone checks, the government stated it was to be expected that Greyhound would make extensive use of these checks if it was making a reasonable and adequate effort to achieve compliance. Of course, the order did not require Greyhound to

---

57. For example, in May and April, 1970 and in January and June, 1971, agents were instructed to quote Mt. Hood's service impartially and to give first consideration to the passengers' convenience and choice.

make telephone checks and Greyhound argued that this was another invented requirement. Greyhound did make use of the telephone in checking compliance. Mr. Nageotte and Mr. Cook testified as to the nature of Greyhound's telephone checks. Nageotte stated that records were not made of all calls because Greyhound was not building a record. Rather, Greyhound's purpose was to make a check and if it was wrong, take immediate corrective action.[58] Cook testified that there were "literally hundreds" of telephone calls made by his office to check compliance; that there was no attempt to make a written record of all calls and that incorrect responses were to be corrected immediately.[59]

Here again, the results of the ICC Surveys illustrate the inadequacy of Greyhound's method of achieving compliance. Having chosen a course of action, Greyhound must bear the responsibility for the failure of that course to achieve the desired end.

The real issue here is whether Greyhound took all steps reasonably necessary to insure compliance with Paragraphs 4 and 5. True, the order did not explicitly require Greyhound's bulletins to state that the company was under a court order to quote Mt. Hood's routes in certain circumstances, or to state that compliance with the directive would be policed by Greyhound, or to state that agents who failed to comply with the directive would be subject to discipline, etc. But Greyhound had an obligation to secure prompt and full compliance with all provisions of the order by whatever means were available to it. In the Answering Brief, Greyhound discussed its compliance program; as indicated above, it consisted of the distribution of bulletins which informed agents that they were to quote Mt. Hood's service in certain situations; Greyhound also made telephone checks on compliance, but rather than make an extensive record of its efforts, Greyhound chose to use on the spot corrections. This Greyhound was free to do. However, it must bear the legal consequences of the failure by its agents to comply with Paragraphs 4 and 5. Wilson v. United States, *supra*, and Parker v. United States, *supra*.

In light of the documented evidence of violations of Paragraphs 4 and 5 (Exhibits B and E of Gould's Affidavit and PX 20, Donohue Exhibit A), the court must conclude that Greyhound *did not* take all steps reasonably necessary to achieve compliance with the order. The most damaging aspect of the evidence is that in July, 1971, about eighteen months *after* the order was entered, the ICC recorded a *51%* rate of incorrect responses, compared to a 58% rate of error in June and July, 1970—six months after the order was entered. These figures strongly suggests that whatever means Greyhound used to insure compliance (bulletins, spot-telephone checks, and agent training) they were not effective means. Certainly, the court would not expect there to be 100% accuracy in the quotation of Mt. Hood's service, but the 51% rate of error recorded in July, 1971, fully supports finding that Greyhound's compliance program left something to be desired. It appears that Greyhound designed a "paper compliance" program, i. e., one in which it sent, received, and accumulated many pieces of paper (bulletins) designed to prove that it had made an effort to comply with Paragraphs 4 and 5. But Greyhound failed to translate that program from the paper bulletins into an effective quoting effort. For if it had, the court would not have a situation where out of over five hundred and thirteen quoting checks over an eighteen month period, by the ICC and Mt. Hood, there were three hundred and forty-four unsatisfactory quotes, or 67% incorrect.[60] Furthermore, the repetitive-

---

58. Nageotte Deposition 56.

59. Cook Deposition 75–76.

60. These figures combine the 1970 and 1971 ICC Surveys with the survey conducted by Mt. Hood. Totals are derived from p. 542, *supra*, pars. 1, 2, and 3.

ness and consistency with which Greyhound agencies failed to quote faster and shorter Mt. Hood service between important origin and destination points negates any inference that the errors were happenstance. For example, the ICC and Mt. Hood recorded *forty-three* separate instances in which Greyhound agents at San Francisco failed to quote relevant Mt. Hood interline service. On *twenty* different occasions between February, 1970 and July, 1971 Greyhound agents at San Francisco quoted only the all-Greyhound service to Yakima, Washington and made no mention of the shorter and/or faster interline or through-bus service with Mt. Hood. The ICC and Mt. Hood recorded *sixteen* instances in which the Greyhound agency at Fresno failed to quote shorter, faster Mt. Hood service to Yakima. On *fifteen* different occasions Greyhound agents at Seattle failed to give information that interline service with Mt. Hood would be the fastest and most convenient routing for a passenger desiring a morning departure for Boise, Idaho. Finally, on *ten* different occasions from March, 1970 to September, 1971, the Greyhound agency at Astoria, Oregon failed to quote interline service with Mt. Hood as the shortest, fastest daytime service to Boise, Idaho. Then, in October, 1971, four months after the contempt actions were filed, the Astoria agency suddenly answered an inquiry by asking whether the inquirer wanted to go all-Greyhound or Mt. Hood by way of Bend, Oregon.

The government has proven beyond a reasonable doubt that there was a willful failure to comply with Paragraphs 4 and 5. Furthermore, responsibility for the failure to comply must fall upon Greyhound. It had the duty to insure that there would be compliance with the order, and it must be held accountable for its failure to secure that compliance. The high percentage of documented quoting errors flys in the face of any Greyhound contention that it did all that

it could do to insure compliance. And as illustrated above, the Greyhound effort at compliance was no where that of the Kroger Company.[61]

Accordingly, the court hereby finds Greyhound in criminal contempt for willfully failing to comply with Paragraphs 4 and 5.

## VIOLATIONS OF PARAGRAPH 6

Paragraph 6 of the order required Greyhound to show Mt. Hood's connecting routes on its maps on an *equal basis* with other non-Greyhound carriers.

The government charged: (1) that Greyhound's map in *Russell's Guide* (p. 54) and in the Greyhound Lines-West Systems Timetable (p. 2), (a) distorts the location of Bend, Oregon; (b) omits Greyhound's routes between The Dalles (Biggs) and Toppenish and Yakima, Washington; and (c) distorts Mt. Hood's service in table 7786 and schedules included in it by showing only a portion of it and omitting Portland to Bend and Boise to Salt Lake City; (2) that Greyhound's Ticket Tear Map. No. 16 did not show any of Mt. Hood's service until October, 1970, and on that date a revised issue of that map distorted and omitted several of Mt. Hood's routes; (3) that the folder *1971 Amazing American Vacations . . . by Greyhound* contains a map on its center page which *omits all* Mt. Hood routes; (4) that the wall maps on public display in Greyhound terminals in Eugene, Corvallis, Albany, and Klamath Falls, Oregon, and Redding and San Jose, California, omit many of Mt. Hood's routes; (5) that Greyhound's map entitled "Approximate Greyhound Travel Time in Hours between Principal Cities," which appears in a Greyhound folder failed to indicate that passengers between San Francisco and Spokane can travel via the joint Mt. Hood-Greyhound through-bus.

In its response Greyhound admitted the fact of publication of the various folder maps and the existence of the

---

61. See comparative analysis at pp. 556–557, *supra*.

wall maps, but denied that they failed to show Mt. Hood's service on an equal basis with other non-Greyhound carriers. Greyhound also denied that it failed to take affirmative measures to correct Greyhound wall maps, stating that various corrections were made upon the filing of the contempt petitions.

The court, having examined the full record of these matters, finds that the respondents willfully failed to comply with the provisions of Paragraph 6, in that they failed to show Mt. Hood's routes on its maps on an equal basis with other non-Greyhound carriers. There is more than sufficient evidence to support the charges of criminal contempt. It should be noted that in evaluating the evidence the court was guided solely by the "equal basis" language of the order. Thus, the court required that Mt. Hood be treated at least as well as any other non-Greyhound carrier.[62]

## GREYHOUND LINES-WEST INDEX MAP

The government charged that this map omitted certain of Mt. Hood's routes and distorted others. In January, 1970, at the time of this court's order, this map only showed Mt. Hood's route between Klamath Falls and The Dalles. The map failed to show several of Mt. Hood's connecting routes. After the court's order was issued, Mt. Hood's official offered suggestions to Greyhound which would bring about compliance with this paragraph.

At the May 26, 1970, meeting between Greyhound, Mt. Hood, and the ICC Director, Mr. Gould, Greyhound showed resistance to complying with Paragraph 6, when it took the position that the document in question was an "Index," not a map, and that Greyhound was not obli-

gated to show competing service on that document.[63]

In July, 1970, Greyhound added some of Mt. Hood's connecting routes but it still omitted some key ones. Furthermore, in adding routes to Bend, Greyhound distorted its location to the detriment of Mt. Hood, in that it incorrectly indicated to a ticket agent selling, or a passenger desiring service from northwestern Oregon to Boise, Idaho, that the all-Greyhound route via Portland would in all cases be faster or shorter than Mt. Hood's route via Bend.

In November, 1971, twenty months after this court's order, Greyhound finally added Mt. Hood's connecting routes on the Index Map, in particular Mt. Hood's Portland-Bend and Boise-Salt Lake City routes.

It is evident from the Index Map itself that Greyhound's failure to show Mt. Hood's connecting routes [64] on this map was unequal treatment of Mt. Hood. For example, the Index Map shows the connecting service of Citizen's Auto Stage Company's route between Tucson, which Greyhound serves, and Nogales, Arizona, which Greyhound does not serve. The Index Map refers not only to the Greyhound table 585 showing Citizen's service, but also refers to Citizen's table 4071. Thus, Greyhound's omission of Mt. Hood's route between Portland, which Greyhound serves and Bend, which Greyhound does not serve, was discriminatory against Mt. Hood, as opposed to its treatment of other non-Greyhound carriers.

In defense of this charge, Greyhound stated that the purpose of the map is to serve as an index to Greyhound schedules found in the tables which follow; it does not purport to represent a geographically accurate map

---

62. The government and the respondents were at each others throats over which standard would be employed in measuring Greyhound's compliance. However, the court does not feel that it is necessary to go beyond the "equal basis" language of the order in deciding the matters raised here.

63. See PX 10, p. 6, Donohue's Notes of May 26, 1970, meeting in Washington, D. C. with Director Gould and Greyhound's officials.

64. Connecting service is service between points served by Greyhound and points not served by Greyhound.

or a map of complete bus service. Assuming Greyhound's position to be true, it does not negate the fact that on this map Greyhound shows the connecting service of Citizen's Auto Stage Company in Arizona. Regardless of the label that Greyhound places on this map, it was shown that Greyhound did not treat Mt. Hood equally with other non-Greyhound carriers. As long as Greyhound chose to show the connecting service of any other carrier on this "Index" Map, it should have also shown the service of Mt. Hood. Here, the failure of Greyhound to show Mt. Hood's connecting service from Albany to Bend, Eugene to Bend, and Portland to Bend, was unequal treatment of Mt. Hood, in violation of Paragraph 6.

 As for other particular routes mentioned in the contempt petitions in connection with the Index Map, the court makes the following findings:

### 1. The Boise-Salt Lake City Route

This route is directly competitive and parallel with Greyhound's Boise-Salt Lake City route. Mt. Hood's Donohue admitted that there is no known instance where the parallel route of a non-Greyhound carrier is shown on Greyhound's Index Maps. In view of this fact, the failure of Greyhound to show the directly competitive Mt. Hood route from Boise to Salt Lake City [65] cannot be regarded as a violation of Paragraph 6.

### 2. Portland to Bend, Oregon Route

Greyhound stated that the omission of this route was an "oversight" which could have readily been corrected had the government told Greyhound. In fact, Greyhound made the correction in November, 1971, and it appears from the record that Greyhound was informed of this omission as early as May, 1970.[66] Thus, it is absurd for Greyhound to claim that it had no notice of the omission. It had ample

notice and Greyhound's failure to make a correction sooner than it did was inexcusable. The court finds that this omission was a willful failure to comply.

### 3. Dalles-Toppenish Route

This is a Greyhound route and the order relates only to the showing of Mt. Hood's connecting routes. No contempt can be based upon Greyhound's failure to show its own routes.

### 4. Distortion of Location of Bend, Oregon

In July, 1970, Greyhound added the Albany-Bend, Eugene-Bend, and Bend-Boise, connecting routes of Mt. Hood. Greyhound did in fact distort the location to Bend to the detriment of Mt. Hood. This distortion was particularly damaging because it incorrectly indicated to a ticket agent selling transportation from northwest Oregon to Boise, and points east, that the all-Greyhound route would in all cases be faster or shorter than the Mt. Hood route via Bend. Greyhound's argument in support of its actions is so frivolous that it is not worthy of a response. Suffice it to say, that in October, 1970, Greyhound knew the location of Bend, but when it had to show Mt. Hood's connecting routes to that city, Greyhound conveniently forgot where Bend was located, thereby inflicting injury on Mt. Hood and subverting the whole benefit of having Mt. Hood's routes portrayed on the map. Such conduct was tantamount to a willful violation of the order and Greyhound was thereby in criminal contempt.

### GREYHOUND'S TICKET TEAR MAP NO. 16

 The government charged that Greyhound omitted and distorted some of Mt. Hood's service on this map, thus failing to treat Mt. Hood on an equal

---

65. Greyhound did add this route to the Index Map, but its previous omission was not contemptuous.

66. See PX 10.

basis with other non-Greyhound carriers. The showing of Mt. Hood's routes of this map has been a bone of contention between the parties for some time.[67] After this court issued its order, Greyhound was again reminded of its duty to publish Mt. Hood's routes on its ticket tear map. Mr. Dick, of Greyhound, was given the responsibility to make certain that the ticket tear map was produced with Mt. Hood's entire service shown. He did in fact order that the map be produced with all of Mt. Hood's routes incorporated and he requested that the changes be confirmed when accomplished.[68] Dick could not recall receiving the confirmation he requested and it appears that after Dick initiated corrective action, he was overruled by Greyhound's top management, which took the position at the May 26, 1970, meeting with Director Gould, that they need not show Mt. Hood's routes on this map because no Trailways carrier, including Mt. Hood, had ever been shown on it.[69] This was a blatant attempt to negate the terms of the order. Paragraph 6, does not say that Greyhound should show Mt. Hood's routes only on maps where they were shown prior to the order, nor does it indicate they should be shown only on maps which Greyhound shows the routes of the National Trailways System carriers.

Notwithstanding Greyhound's stated objections, it did agree to show Mt. Hood's routes on this map and said it would be reissued in about 30 days. However, the map that was to be issued in "about 30 days" did not appear until October 1, 1970, four months after the meeting and ten months after the order.

And when the map did appear, *it omitted important segments of Mt. Hood's routes, and distorted others.*[70] These distortions made Mt. Hood's service appear less desirable in comparison to alternate all-Greyhound routes.

That Greyhound did not treat Mt. Hood on an equal basis with other non-Greyhound carriers is evident from the ticket tear map that was in use in April, 1970, and the revised one was in use at least through March, 1972. That Greyhound map showed *all* of the routes of companies such as Boise-Winnemucca States, Inc., including those parallel with Greyhound.[71]

Mt. Hood, under the "equal basis" language of the order, had requested that all of its routes be shown, including those parallel with Greyhound. Yet, Greyhound, still pursuing its vendetta against Mt. Hood, failed to treat Mt. Hood on an equal basis with other non-Greyhound carriers. In presenting Mt. Hood's routes, Greyhound omitted and distorted them. Greyhound's reluctance to provide a fair and full presentation of Mt. Hood's routes on this map, as it presents the routes of other non-Greyhound carriers, is blatantly contemptuous of Paragraph 6.

Greyhound defends against this charge by stating that the primary purpose of the ticket tear map is to instruct Greyhound agents how to coupon tickets, i. e., the map tells them to provide a separate coupon for each route segment between points circled on the map. Greyhound further stated that (1) the map does not purport to be a geographically accurate, or even a complete map of the routes as it omits some Greyhound

---

67. See background to this problem discussed in Government Brief 156–158.

68. See RND A–20.

69. Donohue's notes of that meeting show that "Greyhound objected to showing PT's routes on their ticket tear map, stating PT had never been shown thereon and no Trailways carrier is shown. . . ." PX 10, p. 6.

70. In the revised edition, Mt. Hood's eastbound routes were shown only to

Ontario, Oregon, thus omitting the service from Ontario to Salt Lake City and intermediate points. Also, the revised map distorted Mt. Hood's service from Klamath Falls to Bend by indicating the route followed a crooked line, whereas in fact it is a straight route. Mt. Hood's service from Bend to Biggs was omitted and service from Albany to Bend, which runs direct between those points, appeared to be indirect.

71. See Ticket Tear Map, FJC–4.

routes; (2) the map fails to show *any* other Trailways carriers, and fails to show the routes of many other non-Greyhound carriers; and that it shows no competing parallel routes; and (3) that since the filing of the contempt petitions, it has revised the Russell's Guide Index Map and the Ticket Tear Map No. 16 so as to remove the alleged distortions. Having carefully reviewed the evidence, the court is of the opinion that Greyhound's defenses are untenable. Regardless of the "primary purpose" of the ticket tear map, there is no denying that this map shows the routes of *at least 38 connecting carriers*. Under the terms of the order, Mt. Hood was entitled to be treated at least as well as other non-Greyhound carriers notwithstanding the fact that it is a member of the Trailways System. That Mt. Hood was not treated at least as well as other non-Greyhound carriers was fully shown. The sequence of events surrounding this map compels the conclusion that Greyhound's failure to comply here was willful. The matter of showing Mt. Hood's routes on this map was discussed by the parties in April, 1970. Mr. Dick commenced compliance, but then his effort was thwarted by Greyhound's top officers. At the May 26, 1970, meeting, Mr. Nageotte took the position that Greyhound was not obligated to show the routes in question. Nevertheless, Greyhound relented and agreed to show them in about thirty days. The thirty days became four months, and when the map was published, it showed Mt. Hood's routes in a distorted and incomplete manner. Greyhound attributed the delay to the "necessity to collect and incorporate all of the various changes which had occurred since the last publication in May, 1968, to insure that the map would be accurate." [72] This excuse would be plausible if the map that was published in November, 1970, was accurate. However, that map did not accurately portray Mt. Hood's routes. See note 70, *supra*. The distortions tended to make Mt. Hood's service less desirable in comparison to alternate all-Greyhound routing.

▇▇▇ Finally, Greyhound contends that upon filing of the contempt petitions, the distortions and omissions in the map were corrected. Greyhound did not publish a revised ticket tear map until May 1972, more than ten months after the contempt petition was filed.[73]

▇▇▇ Accordingly, the court hereby finds that Greyhound's failure to show Mt. Hood's full service on the ticket tear map was a willful failure to comply with Paragraph 6.

## VIOLATIONS WITH REGARD TO WALL MAPS AT AGENCIES

The criminal contempt petitions charged that the wall maps on public display in Greyhound terminals in Eugene, Corvallis, Albany, and Klamath Falls, Oregon, and Redding and San Jose, California, among others, omit many of Mt. Hood's routes.

▇▇▇ On the basis of the evidence before it, the court must conclude that Greyhound's failure to correct the wall maps in the various terminals was willful disobedience of Paragraph 6. Greyhound knew what was expected of it, yet it failed to take corrective action for twenty months after the court's order. Not once during that period of delay did Greyhound ever complain to the ICC or the court that compliance would be a hardship, nor did it ever ask the court for a clarification or modification of the order, as it had a right to do, to determine whether the showing of Mt. Hood's routes on its wall maps was within the requirements of the order.

The principal evidence of wall map discrimination against Mt. Hood is

---

**72.** Respondent's Answering Brief 103.

**73.** Greyhound also raised as a defense the fact that the Trailways System's own ticket tear map fails to show any Greyhound service. This argument is totally irrelevant to the issue at hand of whether Greyhound portrayed Mt. Hood's service on an equal basis with other non-Greyhound lines.

found in the affidavits of Messrs. Niskanen and Donohue of Mt. Hood. Niskanen stated that in May, June, and July, of 1971, he observed large Greyhound wall maps titled "Greyhound Lines and principal connecting lines" in depots at Albany, and Klamath Falls, Oregon, and Redding and Vallejo, California. He further stated that the showing of Mt. Hood's routes on these maps was incomplete, distorted and inaccurate, *"though the routes of other connecting lines were properly shown."* Niskanen stated that Mt. Hood's east-west routes were not shown, nor was the route to Portland, and Mt. Hood's north-south route was shown in an incomplete manner.[74] Donohue's testimony substantially corroborated Niskanen's.[75] This evidence is corroborated by the testimony of joint depot agent Wollertsen of Albany who testified that the map on his wall entitled "Greyhound Lines and Principal Connecting Schedules" did not show the routes of Mt. Hood.[76] Mr. Murray, a commission agent for Greyhound at Salem, Oregon, testified in July, 1971, that the wall map at his agency did not show Mt. Hood's routes east from Salem.[77]

In defense of these charges Greyhound stated (1) that the order did not require them to show competing lines on the wall maps as it was not shown that the lines of other non-Greyhound carriers appeared on these maps;[78] (2) that in the case of joint agents, there was nothing to prevent Mt. Hood from providing them with maps of its lines for display; (3) that the Greyhound maps, in any event, have been revised by the addition of Mt. Hood's routes.

Greyhound's contentions are without merit. There was testimony to the effect that the wall maps entitled "Greyhound Lines and Principal Connecting Carriers" did in fact show the lines of other carriers, see for example, the testimony of Niskanen and Wallenburn, *supra*. Furthermore, the very title of these maps implies that they showed not only Greyhound's lines, but also those of *"Principal Connecting Carriers."*

The argument that Mt. Hood could have provided joint agents with map material is irrelevant. The order required *Greyhound* to treat Mt. Hood on an equal basis with other non-Greyhound lines. If Greyhound showed other lines on these maps it had a duty to show Mt. Hood's lines as well.

While it appears that these wall maps were corrected, it is significant that it took Greyhound until *September, 1971, twenty months after the order was entered,* to accomplish the job. During that period, Greyhound never complained to the ICC or this court that it was not required to show Mt. Hood's routes on this map, or that the task was too difficult.[79]

In light of the foregoing, the court hereby finds that Greyhound's failure to

74. Niskanen Affidavit p. 9.

75. Donohue Affidavit pp. 11–12. Donohue stated that he observed wall maps that omit or distort Mt. Hood service at Eugene (March 17, 1971), Klamath Falls (February 14, 1971), Corvallis (March 18, 1971), and Albany (March 18, 1971) Redding, California, (February 14, 1971), and San Jose (February 15, 1971).

76. Wollertsen Deposition 18–19.

77. Murray Deposition 30. See also the testimony of Leo Wallenburn to the effect that the wall map in his Klamath Falls depot shows the lines of Greyhound *and the lines of certain carriers,* but not those of Mt. Hood. Wallenburn Deposition 42.

78. Greyhound argued that there would be no more reason to expect it to show lines of competing carriers at its agencies than for airlines to show competing lines on the wall maps commonly found at their agencies. Yet, here the very existence of the order commanding Greyhound to show Mt. Hood's routes on an equal basis is reason enough to expect Greyhound to do this as long as they show the routes of others.

79. In fact, soon after Greyhound officials ordered that Mt. Hood's routes be placed on these wall maps with heavy black dotted lines, telegraphs acknowledging that the job was done came from Eugene, Bellingham, Boise, Olympia, Portland, Seattle, Spokane, Tacoma, Yakima, Klamath Falls, Albany and Corvallis.

show Mt. Hood's routes on the depot wall maps until twenty months after the order was a willful failure to comply with Paragraph 6.

## VIOLATIONS REGARDING GREYHOUND TOUR FOLDERS

The government charged as contempt that the folder "1971 Amazing American Vacations, Escorted, Independent, and Special Event Tours by Greyhound" contained a map on its center pages entitled "Greyhound Lines and Principal Connecting Lines" which *omits all* Mt. Hood routes. The court is of the opinion that the failure to show Mt. Hood's routes on this map constituted a willful failure to comply with Paragraph 6.

The folder which contained the map in question was distributed in February, 1971, to the Pacific Trailways agent at Bend, Oregon. Donohue, upon receiving the map noticed that the map in the center omitted *all* of Mt. Hood's routes.[80] Greyhound admitted that the map contained the connecting routes of *"at least a few non-Greyhound carriers,"*[81] thus implicitly admitting its contempt. The order commanded Greyhound to show the routes of Mt. Hood on an equal basis with other non-Greyhound carriers. As long as Greyhound showed the routes of a few connecting carriers on this map, it should have taken special care to be sure that Mt. Hood's routes were included. Of course, if Greyhound chose to show only its routes then it would not have had to show those of Mt. Hood. But it did show some connecting service on the map and the failure to show Mt. Hood's service constitutes a violation of the "equal basis" provision of Paragraph 6.

In defense of the charges, Greyhound urged that the map in question was published in a folder unrelated to the subject matter of the order, and that in any event, this map's publication was suspended in November, 1971, and superseded by one which shows Mt. Hood's connecting routes. It was also argued that the map is essentially illustrative, would not be used for quoting regular route transportation, and the map was a nationwide Greyhound System Map showing the principal national Greyhound routes *and only a relatively few routes of other carriers.*

These defenses are insufficient to negate a finding that the publication of this map without Mt. Hood's routes was a willful violation of this order. Greyhound's last argument has already been discussed. Suffice it to say that as long as Greyhound showed the routes of any connecting carriers on this map, it should have shown those of Mt. Hood.

The fact that the map would not be used for quoting regular service does not exonerate Greyhound. Paragraph 6, was designed to insure that Mt. Hood's service would be shown on an equal basis with other non-Greyhound carriers, which simply means that if Greyhound shows the connecting service of any non-Greyhound carrier, it should also show the service of Mt. Hood. The equal basis language of the order means Mt. Hood must be treated at least as well as any other non-Greyhound line. Here was a map which showed the connecting routes of some non-Greyhound Lines, but not those of Mt. Hood. The only conclusion that can be drawn is that Mt. Hood was not treated at least as well as other non-Greyhound carriers.

The fact that the map has been obsolete since November, 1971, will not suffice to excuse Greyhound for omitting Mt. Hood's routes. The court's order was entered in February, 1970, and within a reasonable period of time Greyhound should have complied with *all* of its provisions. Greyhound cannot now claim that because it discontinued publication of a discriminatory map, *twenty months after the date of the order,* that it was not a violation of the court's order for the period of time that the map was in use.

---

80. Donohue Affidavit 11.

81. Respondent's Answering Brief p. 104.

Finally, the order did not limit the kind of maps Greyhound was to revise; the order was all-inclusive, commanding that Greyhound show Mt. Hood's routes on an equal basis with other non-Greyhound lines on all of its maps. And, although the folder in which the map is found deals with a special operation, i.e., tours, no such limitation is evident from the map itself. The map is titled "Greyhound Lines and Principal Connecting Lines," thus referring to interline service. It is within the scope of Paragraph 6.

The court hereby finds that the failure of Greyhound to show any of Mt. Hood's routes on the map in this tour folder from February, 1970, to November, 1971, was a willful violation of Paragraph 6.

## ALLEGED VIOLATIONS PERTAINING TO A GREYHOUND INSET MAP

The government charged that Greyhound's map entitled "Approximate Greyhound Travel Time in Hours between Principal Cities," in the Greyhound folder "Now You Can Ride Greyhound's Big Bold and Beautiful Super 7 Scenicruisers," violated Paragraph 6.

The court is of the opinion that the failure of Greyhound to publish Mt. Hood's routes in this small map does not constitute a violation of the order. The map in question is a small inset map on a folder page which contains a large map which *does show all of Mt. Hood's routes*. In addition, the inset map is clearly marked as "Approximate *Greyhound* Travel Time . . . ." The court does not believe that the absence of Mt. Hood's routes on this inset map

will have a detrimental effect on agents quoting service or travelers inquiring for service. The failure to show Mt. Hood routes on this map is not contemptuous.

Of the alleged violations of Paragraph 6, the government established beyond a reasonable doubt that five of these were willful violations of the order. Accordingly, the court hereby finds the respondents in criminal contempt for their failure to comply with Paragraph 6.

## VIOLATIONS OF PARAGRAPH 8

Paragraph 8 of the Order required Greyhound to establish joint through fares with Mt. Hood.

The government charged that Greyhound knowingly and willfully violated Paragraph 8 in that Greyhound refused to establish joint through fares with Mt. Hood. In particular, Greyhound is charged with not having established a joint through fare with Mt. Hood for service from Medford to The Dalles via Klamath Falls, Oregon. Having carefully evaluated the record of this charge, the court is of the opinion that there is no evidence to support the charge. Accordingly, the court hereby finds Greyhound not guilty of either civil or criminal contempt.

The government's contempt petitions speak in terms of a refusal by Greyhound to establish a *joint through fare,* yet the evidence speaks in terms of a *fare equalization*. A joint through fare and a fare equalization are not the same.[82]

An analysis of the testimony presented in support of the charge reveals that the government's complaint is not that

82. Mr. Donohue, of Mt. Hood, explained in his deposition that:
"[a] fare equalization is an instance where there is a fare published between two points by a given route and the request is for the same fare to apply by a different route . . . [b]etween the same two points." Donohue Deposition 172.
On the other hand,
"[T]he essential feature of a joint rate is that connecting roads have agreed or

mutually consented to carry traffic from points on one road to points on another road for an aggregate charge which is less than the sum of their local charges between the same points." New York, N. H. & H. R. Co. v. Platt, 7 I.C.C. 323, 333 (1897). Quoted with approval by the Supreme Court in Chicago, M., St. P. & P. R. Co. v. United States, 366 U.S. 745, 747, 81 S.Ct. 1630, 1632, 6 L.Ed.2d 772 (1961).

Greyhound failed to establish joint through fares, but rather that Greyhound has not equalized fares. But nothing in the order required Greyhound to equalize fares.

The complaint charged Greyhound with a failure to establish a joint through fare with Mt. Hood from Medford to The Dalles, via Klamath Falls. Greyhound denied the charge and further alleged that

"[j]oint through fares over the lines of Greyhound and Mt. Hood by way of all connecting points *are and for many years have been published* in National Passenger Tariff A–1000 and National Basing Fare Tariff No. 100, both issued by the National Bus Traffic Association." Greyhound's Response ¶12 (Emphasis added).[83]

Rather than presenting evidence of Greyhound's failure to establish joint through routes, the government merely described a failure by Greyhound to concur in a *fare equalization*—a matter not remotely covered by the order. For example, during the deposition of Mr. Cook, the government attorney asked if Mt. Hood had made a prior request to *"equalize the fare* applicable from Medford to The Dalles via Klamath Falls with the fare between those points applicable via Portland." [84] Cook said that this [a letter from Mt. Hood's Donohue] was the first request for a *fare equalization*. When asked if Donohue's letter was in effect a request to establish a joint through fare, Cook replied that "the joint through fare was *already established.*" [85] The testimony of Mr. Cook and the questions of the government's counsel indicate that the dispute between Mt. Hood and Greyhound centered around Mt. Hood's attempts to obtain a fare equalization, not its attempt to obtain a joint through fare.[86]

Since Paragraph 8 does not require or speak in terms of fare equalizations, it would be wholly improper for this court to predicate a finding of either civil or criminal contempt upon the evidence presented by the government. Paragraph 8 required only that Greyhound establish joint through fares with Mt. Hood and since that which was required was done, there can be no civil or criminal contempt.

## VIOLATIONS OF PARAGRAPH 9

Paragraph 9 of the order required Greyhound to cease and desist from discriminating against Mt. Hood at depots that Mt. Hood occupies with Greyhound.

The government charged that Greyhound knowingly and willfully violated Paragraph 9 in that: (1) a survey conducted by Mrs. Connie Allen, an interline revenue clerk for Mt. Hood, revealed that on December 12, 1970, the agent at the Klamath Falls depot, which Mt. Hood jointly occupies with Greyhound, quoted Greyhound charter service, but not Mt. Hood's charter service; (2) on December 18, 1970 the agent at the Albany depot, a jointly occupied depot, quoted Greyhound charter service, but not that of Mt. Hood; and (3) on December 12, 1970, while Mrs. Allen was present in the Klamath Falls depot, Greyhound service to Portland was announced, but not *similar* Mt. Hood service. The government also added that the charges under Paragraphs 4 and 5 are violations of this Paragraph.

Greyhound denied that it discriminated against Mt. Hood at joint depots and denied that the failure of agents at Klamath Falls and Albany to voluntarily quote Mt. Hood *charter* service without a specific request therefore was a violation of this provision of the order. Greyhound also denied that the failure of the Klamath Falls agent to announce

---

83. It is significant that the government failed in its reply briefs or elsewhere to deny or refute Greyhound's allegation that these joint through fares have existed.

84. Cook Deposition 64–65.

85. Cook Deposition 65–66.

86. Further corroboration of this interpretation of the problem can be found in the direct examination of Mr. Donohue, where the thrust of the inquiry "fare equalization." See Donohue Deposition 172–173.

a Mt. Hood connection from Bend to Portland is a violation of the order inasmuch as the service via Greyhound departing at the same time is faster, shorter and requires no transfer. Greyhound also stands on its reply to Paragraphs 4 and 5. After careful consideration of the evidence of alleged violations of Paragraph 9, the court is of the opinion that Greyhound is not guilty of either civil or criminal contempt. The government failed to prove even by clear and convincing evidence that Greyhound violated Paragraph 9.

The evidence of alleged violations was contained in the affidavit of Mrs. Connie Allen, a Mt. Hood interline revenue clerk. She stated that on December 11, 1970, she called the Albany depot to inquire about charter service. The agent is said to have quoted *only Greyhound* bus service. However, during Mrs. Allen's deposition, she stated that the matter of whether the charter service she was quoted was Greyhound or Mt. Hood's *never came up* and her own notes of the conversation bear this out.[87] The contradictions surrounding this part of Mrs. Allen's testimony make it less than the clear and convincing evidence required to support a finding of civil contempt, and much less than that required to support a finding of criminal contempt.

Mrs. Allen's affidavit also stated that on December 12, 1970, she called the Klamath Falls depot for a quote on a chartered bus. The agent is said to have quoted Greyhound's charter service but not Mt. Hood's charter service. Yet, the import of Mrs. Allen's testimony is diminished by the testimony of Mr. Wallenburn, the joint depot agent at Klamath Falls, who testified that as a rule he and his reservation clerks ask the party seeking charter information which bus line they prefer. He further testified that in certain cases they will favor one bus or the other to meet a specific customer need.[88] Criminal and civil contempts are serious charges and evidence that a violation of the court's order occurred should be persuasive. Here, the only evidence of contempt is *one* reported incident of discrimination which is tempered by testimony to the effect that as a rule the depot agents asked the customer which service they prefer. The court is of the opinion that a finding of contempt should not be predicated upon such slight evidence.

The final incident reported by Mrs. Allen and charged by the government as discrimination against Mt. Hood, pertains to the manner in which the Klamath Falls dispatcher announced departing service. The petition states that on December 12, 1970, while Mrs. Allen was in the Klamath Falls terminal, Greyhound service to Portland, Oregon, was announced but not *similar* or alternative Mt. Hood service. Mrs. Allen testified that the dispatcher, when he announced the 6:30 a.m. departure of the Mt. Hood bus failed to call "connections to Portland."

The court must conclude that the failure of the dispatcher to announce Mt. Hood service to Portland was not discrimination against Mt. Hood for the simple reason that the Mt. Hood bus did not go to Portland. A passenger on the Mt. Hood bus that was announced, who was destined for Portland, would have to change buses at Madras, Oregon. The Greyhound bus called by the dispatcher, which departs about the same time as the Mt. Hood bus, goes directly to Portland; it is shorter and faster than the Mt. Hood service via Madras. In light of these facts, there can be no finding of contempt based upon the dispatcher's failure to call Mt. Hood's bus as one going to Portland.

The court is of the opinion that the government has failed to prove either by clear and convincing evidence or beyond a reasonable doubt that Greyhound discriminated against Mt. Hood at jointly occupied depots. Accordingly,

---

87. Allen Deposition 15 and 19 and Ex. CLA V–4.

88. Wallenburn Deposition 40.

the court finds that Greyhound is not in civil or criminal contempt of Paragraph 9 of the order.[89]

 Finally, the court finds it necessary to comment upon certain evidence of alleged violations of Paragraph 9 which the government presented in its brief, but which the court did not regard as relevant to the charges. The government's brief introduced as evidence of discrimination the fact that certain depot wall maps failed to adequately show Mt. Hood's routes and the fact that at one joint depot, the telephone was answered "Greyhound information." However, the government did not charge these acts as specific acts of contempt in either the civil or criminal petitions. Evidence of acts and omissions that were not charged as specific contempts are irrelevant to prove the substantive charge, and no finding of contempt can be based upon such evidence.

## III. CIVIL CONTEMPT CHARGES

The amended civil contempt petition's allegations are identical to those of the criminal contempt petition. Inasmuch as there has been an extensive discussion of those charges and the supporting evidence, it will be unnecessary to discuss them again, except in those situations where Greyhound still has not complied with the order and thereby is continuing its contempt.

 A civil contempt action is remedial in nature in that it is brought to compel obedience to a court's order. Once compliance has been achieved, civil sanctions are no longer necessary or appropriate. Here, the government has admitted that substantial compliance has been achieved with regard to Paragraphs 1 and 6. The court found neither civil nor criminal contempt as to

Paragraphs 2, 8, and 9. This leaves for present consideration only whether there are continuing violations of Paragraphs 3, 4, and 5. In contrast to criminal contempt, a civil contempt may be predicated upon a finding of "clear and convincing" evidence that there was a lawful order and a violation of that order. Willfulness is not an essential element of civil contempt.

In this civil contempt proceeding, the respondents are: The Greyhound Corporation, and its President, Mr. R. F. Shaffer; Greyhound Lines, Inc., and its President, Mr. J. L. Kerrigan; and Mr. F. L. Nageotte, President of Greyhound Lines-West.

The three individual respondents are actively engaged in the management, direction and control of Greyhound's affairs. Each of these men shared first line responsibility for assuring compliance with this court's order by reason of their executive positions with Greyhound.

The record in this case fully supports a finding that Greyhound and the individual respondents failed at least until the case was taken under advisement, in June, 1972, to effectuate full compliance with Paragraphs 3, 4, and 5. Inasmuch as the court has already found that Paragraphs 3, 4, and 5 were not obeyed, the court hereby adopts those findings for civil contempt purposes.[90] The court further finds that The Greyhound Corporation, Greyhound Lines, Inc., and the three individual respondents continued their disobedience of Paragraphs 3, 4, and 5 and are thereby in civil contempt.

 As for the violations by The Greyhound Corporation and Greyhound Lines, Inc., as named persons subject to the order, they stand or fall on the basis of the compliance program they delegat-

---

89. As for the government's incorporation under Paragraph 9 of all the charges under Paragraphs 4 and 5, the court has made extensive findings in its discussion of the violations of those two paragraphs. In light of those findings the court does not feel it necessary or proper to predicate any further criminal or civil contempts upon that *same* conduct.

90. See discussion of violations of Paragraphs 3, 4, and 5, *supra*.

ed to their wholly-owned subsidiary,[91] Greyhound Lines-West. The parent companies would be responsible even if everyone within the companies was not involved in the specific acts of contempt. United States v. Armour & Co., 168 F.2d 342, 343–344 (3d Cir. 1948). In fact, the attitude and behavior of the high officers of Greyhound Corporation and Greyhound Lines indicate that they were involved in or responsible for specific acts of contempt.[92] Thus, the parent corporations must share responsibility for the consequences of the failure to obey the court's order.

◼ As for the individual corporate officers, the Supreme Court has made them responsible for their acts. A command to a corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the order directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation, are guilty of disobedience and may be punished for contempt. Wilson v. United States, 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771 (1911).

◼ In this case, Nageotte was in charge of Greyhound's entire compliance program. He personally conducted negotiations with Mt. Hood. He was responsible for the decision not to send copies of the order to Greyhound agents, not to follow up any of Mt. Hood's telephone checks, and not to discipline any agents for violations that they committed.[93] These omissions by Nageotte were clearly contemptuous. The effect of his nonfeasance can be observed in quoting errors that continued with alarming regularity well beyond the time the contempt petitions were filed. (See discussion of violations of

Paragraphs 4 and 5, *supra*.) The Greyhound agents and information clerks who committed the quoting violations apparently were not aware of the specific commands of the order. But their ignorance of the order was the direct consequence of deliberate decisions of Greyhound's management, including Nageotte, not to inform its agents of the order and not to mention it in the company's bulletins. Thus, Greyhound, and its top officers intentionally accepted the risk of its employees' or agents' ignorance and they all must shoulder responsibility for the lower echelon employees' failure to comply. Furthermore, Nageotte, as the chief negotiator for Greyhound, was responsible for the failure of Greyhound to negotiate in good faith, in direct violation of Paragraph 3 of the order.

◼ As for Mr. Kerrigan, former President of Greyhound Lines East, he knew of the order and of the fact that Greyhound agents in the east sometimes were called upon to quote service to the Pacific Northwest. He also admitted that he was aware of and implicitly concurred in the decision not to send any bulletins regarding quoting to Greyhound agents in the east. And he concurred in the decision not to mention the order of court decisions in the company's bulletins.[94] Since Paragraph 4, of the order states that the obligation to quote Mt. Hood's services is "without geographical limitation" and since quoting violations occurred in the east (PX 1306–1313), Kerrigan's concurrence in the decision not to try to achieve quoting compliance in the east was a clear act of contempt.

Mr. Shaffer, now the President of Greyhound Corporation and President of Greyhound Lines, Inc. at the time of the issuance of the order, was not produced

---

91. Greyhound Corporation and Greyhound Lines, Inc. took the position that compliance with the order was primarily the responsibility of Greyhound Lines-West and its President, Mr. Nageotte. See Trautman Deposition 10–11, and Hastings Deposition 53–54.

92. See Government Brief 182.

93. Nageotte Deposition 124, 126, 139, 140 and 156.

94. Kerrigan Deposition 25–30.

for deposition in this case because he was out of the country. However, there was a stipulation as to his broad responsibilities as president of the corporation and that his testimony in regard to what steps he took to insure compliance would be approximately the same as the testimony given by Trautman, the Chairman of the Board. Greyhound could produce no document to indicate that Shaffer ever concerned himself with compliance in any way. It does not appear that he ever issued a single instruction or, took any step designed to achieve compliance. In fact, Mr. Hastings, a Vice-President for Greyhound Lines, Inc., testified that he did not know of anything that Shaffer had done to comply with the ICC or the court order.[95]

 The law is clear that neither Shaffer nor Kerrigan can evade their legal duty by refraining from involvement. The defense of non-involvement was raised by two respondents in the criminal contempt action, In re Dolcin Corp., 101 U.S.App.D.C. 118, 247 F.2d 524, 534 (D.C.Cir.1956) cert. denied, 353 U.S. 988, 77 S.Ct. 1285, 1 L.Ed.2d 1143 (1957). The following language of that court is pertinent here:

> "But this court did not impose an obligation on Shimmerlik and Wantz that they could discharge by remaining inert. *We imposed an affirmative obligation upon them, individually, and as officers of Dolcin, to take all reasonable steps to effect compliance with this court's order. . . .* Whatever the order of this court directed Shimmerlik and Wantz to do, it did not permit them to stand idly by while the Dolcin Corporation . . . continued to flout our order. As the Supreme Court has said:
>
>> 'When one accepts an office of joint responsibility, whether on a board of directors of a corporation, the governing board of a municipality, or any other position in which compliance with lawful orders requires joint action by a responsible body of which he is a member, he necessarily assumes an individual responsibility to act, within the limits of his power to do so, to bring about compliance with the order. It may be that the efforts of one member of the board will avail nothing. If he does all he can, he will not be punished because of the recalcitrance of others.' [Citing cases.]
>
> *"Were we to take the opposite view, we would be putting a premium on ignorance and offering a sanctuary for those remiss in performing their duties as corporate officers. . . .* Shimmerlik and Wantz should not be permitted to use their own inertia as a shield against the force of this court's decree." [Emphasis added.]

In this case, the Greyhound officers in whom responsibility for compliance with the order rested in the first instance had an affirmative duty to act to insure compliance. They had to take all steps reasonably necessary to insure that this court's order would be obeyed. That they failed to do their duty is evident from the fact that violations of some paragraphs continued beyond the date of the filing of the contempt petitions; other paragraphs were complied with only as the pressure of this litigation became too great to bear. Responsibility for Greyhound's continuing failure to comply with Paragraphs 3, 4, and 5, must lie not only with the corporation, but also with those individuals who by reason of their executive positions had the duty to insure that the order of this court would be obeyed.

As of the date that this case was taken under advisement, there was no indication that the good faith negotiations required by Paragraph 3, had been concluded. Yet the order specifically commanded Greyhound to "negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public." Nageotte, as Greyhound's chief negotiator, must bear responsibility for this con-

---

95. Hastings Deposition 275. See also Government's Brief 187–188.

tinuing violation. As for Paragraphs 4 and 5, as noted in the extensive discussion of those paragraphs, *supra*, there continued to be quoting errors in 51% of the sample inquiries as late as eighteen months after the order was entered. This high percentage of quoting errors long after the order was entered stands as damning evidence that Greyhound and its chief executives did not take the requirements of Paragraphs 4 and 5, seriously. It stands as a tribute to the unwillingness of Greyhound and its chief executives to take all steps reasonably necessary to insure that the agents who deal directly with the traveling public would quote Mt. Hood's service in the manner contemplated by the order.[98] For this, Greyhound and the officers named in the civil contempt petition must bear the consequence.

Accordingly, the court hereby adjudges The Greyhound Corporation, Greyhound Lines, Inc., Mr. R. F. Shaffer, Mr. J. L. Kerrigan, and Mr. F. L. Nageotte to be in civil contempt for continuing disobedience of Paragraphs 3, 4, and 5, of this court's order.

In the criminal petition the government has asked that an appropriate fine be imposed upon the corporate respondents and that the government be awarded the cost of this proceeding.

In the civil petition the government has asked for:

1. An order requiring the respondents to immediately comply with the previous order of this court;

2. An order requiring the respondents to employ at their own expense an independent auditing agency acceptable to the ICC and the court, to monitor Greyhound's compliance with Paragraphs 1, 4, 5, and 6;

3. An order requiring Greyhound to notify its agents about quoting specific Mt. Hood routes and the contempt citation;

4. An order pertaining to the printing of Mt. Hood's schedules in Greyhound time folders;

5. An order relating to the Burley, Idaho, and Eugene, Oregon, connections; and

6. An order imposing an appropriate fine upon all respondents and imprisonment for the individual respondents.

The Pre-Trial Order for this case states that there shall be further briefing and hearing on the issue of appropriate sanctions for relief. The government shall have twenty days from the date of this order to file a brief on the issue of sanctions. The respondents shall thereafter have twenty days to answer. The government shall then have ten days to reply.

It is therefore, ordered that the foregoing opinion shall stand as findings of the fact and conclusions of law.

Respondents Greyhound Corporation and Greyhound Lines, Inc., are hereby adjudged to be in criminal contempt for willful violations of Paragraphs 1, 3, 4, 5, and 6, of this court's order dated February 5, 1970.

Respondents Greyhound Corporation, Greyhound Lines, Inc., J. L. Kerrigan, R. F. Shaffer, and F. L. Nageotte, are hereby adjudged to be in civil contempt for continuing violations of Paragraphs 3, 4, and 5, of this court's order dated February 5, 1970.

The corporate and individual respondents are hereby found not guilty of either civil or criminal contempt for alleged violations of Paragraphs 2, 8, and 9.

98. *Cf.* United States v. Kroger, *supra,* which illustrates the kind of steps corporate executives may take to assure a court that the matter of compliance is being taken seriously.